McNARY, COMMISSIONER OF IMMIGRATION AND
NATURALIZATION, ET AL. *v.* HAITIAN
REFUGEE CENTER, INC., ET AL.

No. 89–1332.   Argued October 29, 1990—Decided February 20, 1991

STEVENS, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, O'CONNOR, KENNEDY, and SOUTER, JJ., joined, and in Parts I, II, III, and IV of which WHITE, J., joined. REHNQUIST, C. J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 499.

*Michael R. Dreeben* argued the cause for petitioners. With him on the briefs were *Solicitor General Starr, Assist-*

*ant Attorney General Gerson, Deputy Solicitor General Sha-
piro*, and *David V. Bernal*.

*Ira J. Kurzban* argued the cause for respondents.  With
him on the brief were *Bruce J. Winick, Irwin P. Stotzky*, and
*Edward Copeland*.*

JUSTICE STEVENS delivered the opinion of the Court.†

The Immigration Reform and Control Act of 1986 (Reform
Act)[1] constituted a major statutory response to the vast
tide of illegal immigration that had produced a "shadow popu-
lation" of literally millions of undocumented aliens in the
United States.  On the one hand, Congress sought to stem
the tide by making the plight of the undocumented alien even
more onerous in the future than it had been in the past;
thus, the Reform Act imposed criminal sanctions on employ-
ers who hired undocumented workers[2] and made a number

---

*Briefs of *amici curiae* urging affirmance were filed for the State of
California et al. by *Joseph R. Austin, John K. Van de Kamp*, Attorney
General of California, *Andrea Sheridan Ordin*, Chief Assistant Attorney
General, *Fredric D. Woocher, Robert A. Ginsburg, Niels Frenzen, Jorge
L. Fernandez*, and *Richard K. Mason;* for the American Bar Association
by *John J. Curtin, Jr., Robert E. Juceam, Sandra M. Lipsman, Craig H.
Baab*, and *Carol L. Wolchok;* for the American Federation of Labor and
Congress of Industrial Organizations by *Michael Rubin, Marsha S. Ber-
zon*, and *Laurence Gold;* and for the Farm Labor Alliance et al. by *Peter
A. Schey, Wayne H. Matelski, Monte B. Lake, Ralph Santiago Abascal*,
and *Robert Gibbs*.

†JUSTICE WHITE joins only Parts I, II, III, and IV of this opinion.

[1] Pub. L. 99–603, 100 Stat. 3359.

[2] Prior to November 6, 1986, the enactment date of the Reform Act, the
employment of undocumented aliens did not violate federal law.  See 66
Stat. 228, as amended, 8 U. S. C. § 1324(a) (1982 ed.) (providing that "for
the purposes of this section [criminalizing the bringing in and harboring of
aliens not lawfully entitled to enter and reside in the United States], em-
ployment (including the usual and normal practices incident to employ-
ment) shall not be deemed to constitute harboring").  Section 101 of the

of federally funded welfare benefits unavailable to these aliens.[3] On the other hand, in recognition that a large segment of the shadow population played a useful and constructive role in the American economy,[4] but continued to reside in perpetual fear,[5] the Reform Act established two broad

Reform Act, however, authorized both civil and criminal penalties against employers who hire unauthorized aliens either knowingly or without complying with specified verification requirements. See 8 U. S. C. § 1324a.

[3] Section 121 of the Reform Act amended several federal programs to deny benefits to aliens who could not verify their lawful status. See Pub. L. 99–603, 100 Stat. 3384–3394.

[4] The House Committee noted the purpose behind the legalization programs in the Reform Act:

"The United States has a large undocumented alien population living and working within its borders. Many of these people have been here for a number of years and have become a part of their communities. Many have strong family ties here which include U. S. citizens and lawful residents. They have built social networks in this country. They have contributed to the United States in myriad ways, including providing their talents, labor and tax dollars. However, because of their undocumented status, these people live in fear, afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords or when they become ill.

"Continuing to ignore this situation is harmful to both the United States and the aliens themselves. However, the alternative of intensifying interior enforcement or attempting mass deportations would be both costly, ineffective, and inconsistent with our immigrant heritage.

"The Committee believes that the solution lies in legalizing the statuts [sic] of aliens who have been present in the United States for several years, recognizing that past failures to enforces [sic] the immigration laws have allowed them to enter and to settle here.

"This step would enable INS to target its enforcement efforts on new flows of undocumented aliens and, in conjunction with the proposed employer sanctions programs, help stem the flow of undocumented people to the United States. It would allow qualified aliens to contribute openly to society and it would help to prevent the exploitation of this vulnerable population in the work place." H. R. Rep. No. 99–682, pt. 1, p. 49 (1986).

[5] Senator Simpson, one of the sponsors of the Reform Act, described the vulnerability of this "subculture of human beings who are afraid to go to

amnesty programs to allow existing undocumented aliens to emerge from the shadows.

The first amnesty program permitted any alien who had resided in the United States continuously and unlawfully since January 1, 1982, to qualify for an adjustment of his or her status to that of a lawful permanent resident. See 100 Stat. 3394, as amended, 8 U. S. C. § 1255a. The second program required the Attorney General to adjust the status of any alien farmworker who could establish that he or she had resided in the United States and performed at least 90 days of qualifying agricultural work during the 12-month period prior to May 1, 1986, provided that the alien could also establish his or her admissibility in the United States as an immigrant. The Reform Act required the Attorney General first to adjust the status of these aliens to "[s]pecial agricultural workers" (SAW's) lawfully admitted for temporary residence, see 100 Stat. 3417, as amended, 8 U. S. C. § 1160(a)(1), and then eventually to aliens lawfully admitted for permanent residence, see § 1160(a)(2).

This case relates only to the SAW amnesty program. Although additional issues were resolved by the District Court and the Court of Appeals, the only question presented to us is whether § 210(e) of the Immigration and Nationality Act (INA), which was added by § 302(a) of the Reform Act and sets forth the administrative and judicial review provisions of the SAW program, see 8 U. S. C. § 1160(e), precludes a federal district court from exercising general federal-question jurisdiction over an action alleging a pattern or practice of procedural due process violations by the Immigration and Naturalization Service (INS) in its administration of the SAW program. We hold that given the absence of clear con-

---

the cops, afraid to go to a hospital, afraid to go to their employer who says 'One peep out of you, buster, and you are down the road.'" 132 Cong. Rec. 33222 (1986).

gressional language mandating preclusion of federal juris-
diction and the nature of respondents' requested relief, the
District Court had jurisdiction to hear respondents' constitu-
tional and statutory challenges to INS procedures. Were we
to hold otherwise and instead require respondents to avail
themselves of the limited judicial review procedures set forth
in § 210(e) of the INA, meaningful judicial review of their
statutory and constitutional claims would be foreclosed.

## I

The Reform Act provided three important benefits to an
applicant for SAW status. First, the mere filing of a "non-
frivolous application" entitled the alien to a work author-
ization that would remain valid during the entire period
that the application was being processed. See 8 U. S. C.
§ 1160(d)(2)(B). Second, regardless of the disposition of the
application, the Reform Act expressly prohibited the Gov-
ernment from using any information in the application for
enforcement purposes. Thus, the application process could
not be used as a means of identifying deportable aliens;
rather, the initiation of a deportation proceeding had to
be based on evidence obtained from an independent source.
See § 1160(b)(6). Third, if SAW status was granted, the
alien became a lawful temporary resident, see § 1160(a)(1),
and, in due course, could obtain the status of a permanent
resident, see § 1160(a)(2).

In recognition that the fear of prosecution or deportation
would cause many undocumented aliens to be reluctant to
come forward and disclose their illegal status, the Reform
Act directed the Attorney General to enlist the assistance
of a variety of nonfederal organizations to encourage aliens to
apply and to provide them with counsel and assistance during
the application process. These "qualified . . . designated
entities" (QDE's), which included private entities such as
farm labor organizations and associations of agricultural

employers as well as qualified state, local, and community groups, were not allowed to forward applications for SAW status to the Attorney General unless the applicant consented.   See §§ 1160(b)(2), (b)(4).

The Reform Act provided that SAW status applications could be filed with a specially created legalization office (LO), or with a QDE, which would forward applications to the appropriate LO, during an 18-month period commencing on June 1, 1987.   See § 1160(b)(1)(A).   Regulations adopted by the INS to administer the program provided for a personal interview of each applicant at an LO.   See 8 CFR § 210.2(c)(2)(iv) (1990).   In the application, the alien had to prove by a preponderance of the evidence that he or she worked the requisite 90 days of qualifying seasonal agricultural services. See §§ 210.3(a), (b)(1).   To meet the burden of proof, the applicant was required to present evidence of eligibility independent of his or her own testimony.   See § 210.3(b)(2). The applicant could meet this burden through production of his or her employer's payroll records, see 8 U. S. C. § 1160(b)(3)(B)(ii), or through submission of affidavits "by agricultural producers, foremen, farm labor contractors, union officials, fellow employees, or other persons with specific knowledge of the applicant's employment," see 8 CFR § 210.3(c)(3) (1990). At the conclusion of the interview and of the review of the application materials, the LO could deny the application or make a recommendation to a regional processing facility that the application be either granted or denied.   See § 210.1(q). A denial, whether at the regional or local level, could be appealed to the legalization appeals unit, which was authorized to make the final administrative decision in each individual case.   See § 103.3(a)(2)(iii).

The Reform Act expressly prohibited judicial review of such a final administrative determination of SAW status except as authorized by § 210(e)(3)(A) of the amended INA.

That subsection permitted "judicial review of such a denial only in the judicial review of an order of exclusion or deportation."[6] In view of the fact that the courts of appeals constitute the only fora for judicial review of deportation orders, see 75 Stat. 651, as amended, 8 U. S. C. § 1105a, the statute plainly foreclosed any review in the district courts of individual denials of SAW status applications. Moreover, absent initiation of a deportation proceeding against an unsuccessful applicant, judicial review of such individual determinations was completely foreclosed.

---

[6] The full text of § 210(e) of the INA, as set forth in 8 U. S. C. § 1160(e), reads as follows:

"(e) Administrative and judicial review

"(1) Administrative and judicial review

"There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.

"(2) Administrative review

"(A) Single level of administrative appellate review

"The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of such a determination.

"(B) Standard for review

"Such administrative appellate review shall be based solely upon the administrative record established at the time of the determination on the application and upon such additional or newly discovered evidence as may not have been available at the time of the determination.

"(3) Judicial review

"(A) Limitation to review of exclusion or deportation

"There shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation under section 1105a of this title.

"(B) Standard for judicial review

"Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole."

## II

This action was filed in the District Court for the Southern District of Florida by the Haitian Refugee Center, the Migration and Refugee Services of the Roman Catholic Diocese of Palm Beach,[7] and 17 unsuccessful individual SAW applicants. The plaintiffs sought relief on behalf of a class of alien farmworkers who either had been or would be injured by unlawful practices and policies adopted by the INS in its administration of the SAW program. The complaint alleged that the interview process was conducted in an arbitrary fashion that deprived applicants of the due process guaranteed by the Fifth Amendment to the Constitution. Among other charges, the plaintiffs alleged that INS procedures did not allow SAW applicants to be apprised of or to be given opportunity to challenge adverse evidence on which denials were

---

[7] The complaint alleges that this respondent has the following interest in the litigation:

"Plaintiff MIGRATION AND REFUGEE SERVICES OF THE ROMAN CATHOLIC DIOCESE OF PALM BEACH ("RCDPB") is a component of the Roman Catholic Diocese of Palm Beach. Its principle [sic] place of business is West Palm Beach, Florida. Many members of parishes within the diocese of Palm Beach are foreign agricultural workers who worked at least 90 man-days in the 1985 and 1986 season, and are therefore potentially eligible for the SAW program. In addition, Plaintiff MIGRATION AND REFUGEE SERVICES OF THE RCDPB has been designated by Defendant INS as a "Qualified Designated Entity" (QDE) under IRCA. QDE's are authorized to provide counseling to aliens about the legalization program, to assist them in filling out applications and obtain documentation, and receive applications for adjustment to temporary resident status. Under IRCA, applications filed with a QDE are deemed to have been filed as of the same date with INS, to whom the QDE's forward the applications for processing. QDE's are authorized to receive fees from applicants and reimbursement from INS for counseling and filing services. The actions of Defendants complained of in this case discourages otherwise eligible SAW applicants from seeking counseling and filing of their applications by Plaintiffs MIGRATION AND REFUGEE SERVICES OF THE RCDPB and prevents them from fulfilling its basic mission of assisting aliens to qualify under IRCA." App. 24.

predicated, that applicants were denied the opportunity to present witnesses on their own behalf, that non-English speaking Haitian applicants were unable to communicate effectively with LO's because competent interpreters were not provided, and that no verbatim recording of the interview was made, thus inhibiting even any meaningful administrative review of application denials by LO's or regional processing facilities. See App. 44–45; *Haitian Refugee Center, Inc.* v. *Nelson*, 694 F. Supp. 864, 867 (SD Fla. 1988).

After an evidentiary hearing, the District Court ruled that it had jurisdiction, that the case should proceed as a class action, and that a preliminary injunction should issue. The court recognized that individual aliens could not contest the denial of their SAW applications "unless and until the INS institut[ed] deportation proceedings against them," but accepted jurisdiction because the complaint "does not challenge any individual determination of any application for SAW status but rather attacks the manner in which the entire program is being implemented, allegations beyond the scope of administrative review."[8] On the merits, the District Court

---

[8] *Haitian Refugee Center, Inc.* v. *Nelson*, 694 F. Supp. 864, 873 (SD Fla. 1988). The District Court also found that both of the organizational plaintiffs had standing. It explained:

"HRC has alleged that the '[d]efendants' refusal to recognize that such persons [HRC's members] are eligible under IRCA both directly and indirectly injures HRC. It directly injures the organization because it makes HRC's work of assisting the Haitian refugee community more difficult and results in the diversion of HRC's limited resources away from members and clients having other urgent needs.' Complaint at ¶ 17. HRC also alleges an indirect injury through the adverse effect upon its members. *Id.* The plaintiff MRS is a QDE under IRCA authorized to provide counseling to aliens about the legalization process and to assist them in obtaining documentation. It also receives applications and fees from aliens and is reimbursed by the INS for counseling and filing services. MRS alleges that the defendants' behavior has discouraged otherwise eligible SAW applicants from seeking counseling and/or filing their claims and MRS is prevented from fulfilling its basic mission of assisting aliens to qualify under IRCA." *Id.*, at 874–875.

found that a number of INS practices violated the Reform Act and were unconstitutional,[9] and entered an injunction requiring the INS to vacate large categories of denials,[10] and to modify its practices in certain respects.[11]

The Court of Appeals affirmed. On the merits, it upheld all of the findings and conclusions of the District Court, and it

[9] Although many employers did not maintain payroll records for seasonal workers, some LO's routinely denied applications that were not supported by such records. The District Court found that the INS maintained a secret list of employers whose supporting affidavits were routinely discredited without giving applicants an opportunity to corroborate the affiants' statements. See *id.*, at 871–872. The District Court moreover found that interpreters were not provided at LO interviews, even though many Haitian applicants spoke only Creole and no personnel in a particular LO understood that language, and that no recordings or transcripts of LO interviews were made, despite the fact that the interview "is the only face to face encounter between the applicant and the INS allowing the INS to assess the applicant's credibility." See *id.*, at 869.

[10] The preliminary injunction provides in part:

"(3) In those cases which the INS denied based in whole or in part on the fact that the applicant failed to submit payroll records or piecework receipts, the INS shall vacate the denials and reconsider the cases in light of the proper standard of proof which will require the government to present evidence to negate the just and reasonable inference created by the affidavits and other documents submitted by the applicant;

"(4) The INS shall vacate those denials issued by the Legalization Offices during the period June 1, 1987, to March 29, 1988, unless the government can show that the applications were clearly frivolous based upon the documentation submitted by the applicant or that the applicant admitted fraud or misrepresentation in the application process." *Id.*, at 881.

[11] The preliminary injunction entered by the District Court ordered the INS to institute the following procedures:

"(6) The Legalization Offices shall maintain competent translators, at a minimum, in Spanish and Haitian Creole, and translators in other languages shall be made available if necessary;

"(7) The INS shall afford the applicants the opportunity to present witnesses at the interview including but not limited to growers, farm labor contractors, co-workers, and any other individuals who may offer testimony in support of the applicant;

"(8) The interviewers shall be directed to particularize the evidence offered, testimony taken, credibility determinations, and any other relevant information on the form I–696." *Ibid.*

also rejected each of the Government's jurisdictional arguments. Relying on earlier Circuit precedent, it held that the statutory bar to judicial review of individual determinations was inapplicable:

> "In *Jean* v. *Nelson*, 727 F. 2d 957 (11th Cir. 1984) (in banc), *aff'd*, 472 U. S. 846 . . . (1985), we reaffirmed that section 106 of the INA (Codified at 8 U. S. C. § 1105a) does not deprive district courts of jurisdiction to review allegations of systematic abuses by INS officials. *Jean*, 727 F. 2d at 980. We explained that to postpone 'judicial resolution of a disputed issue that affects an entire class of aliens until an individual petitioner has an opportunity to litigate it on habeas corpus would foster the very delay and procedural redundancy that Congress sought to eliminate in passing § 1105a.' *Id.* In this action, appellees do not challenge the merits of any individual status determination; rather . . . they contend that defendants' policies and practices in processing SAW applications deprive them of their statutory and constitutional rights." *Haitian Refugee Center, Inc.* v. *Nelson*, 872 F. 2d 1555, 1560 (CA11 1989).

In their certiorari petition, petitioners did not seek review of the District Court's rulings on the merits or the form of its injunctive relief. Our grant of certiorari is therefore limited to the jurisdictional question.

### III

We preface our analysis of petitioners' position with an identification of matters that are not in issue. First, it is undisputed that SAW status is an important benefit for a previously undocumented alien. This status not only protects the alien from deportation; it also creates job opportunities that are not available to an alien whose application is denied. Indeed, the denial of SAW status places the alien in an even worse position than he or she was in before the Reform Act was passed because lawful employment opportunities are no

longer available to such persons. Thus, the successful applicant for SAW status acquires a measure of freedom to work and to live openly without fear of deportation or arrest that is markedly different from that of the unsuccessful applicant. Even disregarding the risk of deportation, the impact of a denial on the opportunity to obtain gainful employment is plainly sufficient to mandate constitutionally fair procedures in the application process. At no time in this litigation have petitioners asserted a right to employ arbitrary procedures, or questioned their obligation to afford SAW status applicants due process of law.

Nor, at this stage of the litigation, is there any dispute that the INS routinely and persistently violated the Constitution and statutes in processing SAW applications. Petitioners do not deny that those violations caused injury in fact to the two organizational plaintiffs as well as to the individual members of the plaintiff class. Although it does not do so explicitly, petitioners' argument assumes that the District Court would have federal-question jurisdiction over the entire case if Congress had not, through the Reform Act, added § 210(e) to the INA. The narrow issue, therefore, is whether § 210(e), which bars judicial review of individual determinations except in deportation proceedings, also forecloses this general challenge to the INS' unconstitutional practices.

## IV

Petitioners' entire jurisdictional argument rests on their view that respondents' constitutional challenge is an action seeking "judicial review of a determination respecting an application for adjustment of status" and that district court jurisdiction over the action is therefore barred by the plain language of § 210(e)(1) of the amended INA. See 8 U. S. C. § 1160(e)(1).[12] The critical words in § 210(e)(1),

---

[12] As petitioners state in their brief:

"The Act declares in all-encompassing terms: 'There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this sub-

however, describe the provision as referring only to review "of *a determination* respecting *an application*" for SAW status (emphasis added). Significantly, the reference to "a determination" describes a single act rather than a group of decisions or a practice or procedure employed in making decisions. Moreover, when § 210(e)(3), see 8 U. S. C. § 1160(e)(3), further clarifies that the only judicial review permitted is in the context of a deportation proceeding, it refers to "judicial review of *such a denial*"—again referring to a single act, and again making clear that the earlier reference to "a determination respecting an application" describes the denial of an individual application. We therefore agree with the District Court's and the Court of Appeals' reading of this language as describing the process of direct review of individual denials of SAW status, rather than as referring to general collateral challenges to unconstitutional practices and policies used by the agency in processing applications.

---

section.' 8 U. S. C. 1160(e)(1). In the following paragraphs, the subsection spells out the precise procedures intended to provide the exclusive method of review. The subsection requires the establishment of 'a single level of administrative appellate review of such a determination,' and unequivocally states that '[t]here shall be judicial review of such a denial [of a SAW application] only in the judicial review of an order of exclusion or deportation under section 1105a of this title.' 8 U. S. C. 1160(e)(2)(A) and (e)(3)(A). Section 1105a(a), in turn, provides that a petition for review in the court of appeals 'shall be the sole and exclusive procedure for[ ] the judicial review of all final orders of deportation,' while exclusion orders are reviewable exclusively in habeas corpus proceedings. 8 U. S. C. 1105a(b). Congress could hardly have chosen clearer or more forceful language to express its intention to preclude *any* judicial review of a 'determination respecting an application' for SAW status, other than in the specified review proceedings applicable to individual deportation or exclusion orders.

"In light of IRCA's clear directions, district courts are not free to draw on their federal question jurisdiction under 28 U. S. C. 1331, or on their jurisdiction granted under the immigration laws, 8 U. S. C. 1329, to entertain collateral attacks on procedures used to adjudicate SAW applications. The exercise of either source of general power is barred by the precise and specific language of IRCA." Brief for Petitioners 11–13 (footnotes omitted).

This reading of the Reform Act's review provision is supported by the language in §210(e)(3)(B) of the INA, which provides that judicial review "shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole." 8 U. S. C. §1160(e)(3)(B). This provision incorporates an assumption that the limited review provisions of §210(e) apply only to claims that have been subjected to administrative consideration and that have resulted in the creation of an adequate administrative record. However, the record created during the SAW administrative review process consists solely of a completed application form, a report of medical examination, any documents or affidavits that evidence an applicant's agricultural employment and residence, and notes, if any, from an LO interview—all relating to a single SAW applicant. Because the administrative appeals process does not address the kind of procedural and constitutional claims respondents bring in this action, limiting judicial review of these claims to the procedures set forth in §210(e) is not contemplated by the language of that provision.

Moreover, the "abuse-of-discretion" standard of judicial review under §210(e)(3)(B) would make no sense if we were to read the Reform Act as requiring constitutional and statutory challenges to INS procedures to be subject to its specialized review provision. Although the abuse-of-discretion standard is appropriate for judicial review of an administrative adjudication of the facts of an individual application for SAW status, such a standard does not apply to constitutional or statutory claims, which are reviewed *de novo* by the courts. The language of §210(e)(3)(B) thus lends substantial credence to the conclusion that the Reform Act's review pro-

vision does not apply to challenges to INS' practices and procedures in administering the SAW program.

Finally, we note that had Congress intended the limited review provisions of § 210(e) of the INA to encompass challenges to INS procedures and practices, it could easily have used broader statutory language. Congress could, for example, have modeled § 210(e) on the more expansive language in the general grant of district court jurisdiction under Title II of the INA by channeling into the Reform Act's special review procedures "all causes . . . arising under any of the provisions" of the legalization program. 66 Stat. 230, 8 U. S. C. § 1329. It moreover could have modeled § 210(e) on 38 U. S. C. § 211(a), which governs review of veterans' benefits claims, by referring to review "on all questions of law and fact" under the SAW legalization program.

Given Congress' choice of statutory language, we conclude that challenges to the procedures used by INS do not fall within the scope of § 210(e). Rather, we hold that § 210(e) applies only to review of denials of individual SAW applications. Because respondents' action does not seek review on the merits of a denial of a particular application, the District Court's general federal-question jurisdiction under 28 U. S. C. § 1331 to hear this action remains unimpaired by § 210(e).

V

Petitioners place their principal reliance on our decision in *Heckler* v. *Ringer*, 466 U. S. 602 (1984). The four respondents in *Ringer* wanted to establish a right to reimbursement under the Medicare Act for a particular form of surgery that three of them had undergone and the fourth allegedly needed. They sought review of the Secretary's policy of refusing reimbursement for that surgery in an original action filed in the District Court, without exhausting the procedures specified in the statute for processing reimbursement claims. The District Court dismissed the case for lack of jurisdiction because the essence of the complaint was a claim of entitlement to payment for the surgical procedure. With respect

to the three respondents who had had the surgery, we concluded that "it makes no sense" to construe their claims "as anything more than, at bottom, a claim that they should be paid for their BCBR [bilateral carotid body resection] surgery," *id.*, at 614, since success in their challenge of the Secretary's policy denying reimbursement would have the practical effect of also deciding their claims for benefits on the merits. "Indeed," we noted, "the relief that respondents seek to redress their supposed 'procedural' objections is the invalidation of the Secretary's current policy and a 'substantive' declaration from her that the expenses of BCBR surgery are reimbursable under the Medicare Act." *Ibid.* Concluding that respondents' judicial action was not "collateral" to their claims for benefits, we thus required respondents first to pursue their administrative remedies. In so doing, we found it significant that respondents, even if unsuccessful before the agency, "clearly have an adequate remedy in § 405(g) for challenging [in the courts] all aspects of the Secretary's denial of their claims for payment for the BCBR surgery." *Id.*, at 617.[13]

Unlike the situation in *Heckler*, the individual respondents in this action do not seek a substantive declaration that they are entitled to SAW status. Nor would the fact that they prevail on the merits of their purportedly procedural objections have the effect of establishing their entitlement to SAW status. Rather, if allowed to prevail in this action, respondents would only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures.

---

[13] The Court in *Heckler* also concluded that the fourth respondent's claim was "essentially one requesting the payment of benefits for BCBR surgery, a claim cognizable only under § 405(g)," 466 U. S., at 620, and held that the "claim for future benefits must be construed as a 'claim arising under' the Medicare Act because any other construction would allow claimants substantially to undercut Congress' carefully crafted scheme for administering the Medicare Act." *Id.*, at 621.

Moreover, unlike in *Heckler*, if not allowed to pursue their claims in the District Court, respondents would not as a practical matter be able to obtain meaningful judicial review of their application denials or of their objections to INS procedures notwithstanding the review provisions of § 210(e) of the amended INA. It is presumable that Congress legislates with knowledge of our basic rules of statutory construction, and given our well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action, see *Bowen* v. *Michigan Academy of Family Physicians,* 476 U. S. 667, 670 (1986), coupled with the limited review provisions of § 210(e), it is most unlikely that Congress intended to foreclose all forms of meaningful judicial review.

Several aspects of this statutory scheme would preclude review of respondents' application denials if we were to hold that the District Court lacked jurisdiction to hear this challenge. Initially, administrative or judicial review of an agency decision is almost always confined to the record made in the proceeding at the initial decisionmaking level, and one of the central attacks on INS procedures in this litigation is based on the claim that such procedures do not allow applicants to assemble adequate records. As the District Court found, because of the lack of recordings or transcripts of LO interviews and the inadequate opportunity for SAW applicants to call witnesses or present other evidence on their behalf, the administrative appeals unit of the INS, in reviewing the decisions of LO's and regional processing facilities, and the courts of appeals, in reviewing SAW denials in the context of deportation proceedings, have no complete or meaningful basis upon which to review application determinations.

Additionally, because there is no provision for direct judicial review of the denial of SAW status unless the alien is later apprehended and deportation proceedings are initiated, most aliens denied SAW status can ensure themselves review in courts of appeals only if they voluntarily surrender themselves for deportation. Quite obviously, that price is tanta-

mount to a complete denial of judicial review for most undocumented aliens.

Finally, even in the context of a deportation proceeding, it is unlikely that a court of appeals would be in a position to provide meaningful review of the type of claims raised in this litigation. To establish the unfairness of the INS practices, respondents in this case adduced a substantial amount of evidence, most of which would have been irrelevant in the processing of a particular individual application. Not only would a court of appeals reviewing an individual SAW determination therefore most likely not have an adequate record as to the pattern of INS' allegedly unconstitutional practices, but it also would lack the factfinding and record-developing capabilities of a federal district court. As the American Bar Association as *amicus* points out, statutes that provide for only a single level of judicial review in the courts of appeals "are traditionally viewed as warranted only in circumstances where district court factfinding would unnecessarily duplicate an adequate administrative record—circumstances that are not present in 'pattern and practice' cases where district court factfinding is essential [given the inadequate administrative record]." Brief for American Bar Association as *Amicus Curiae* 7. It therefore seems plain to us, as it did to the District Court and the Court of Appeals, that restricting judicial review to the courts of appeals as a component of the review of an individual deportation order is the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims.

Decision in this case is therefore supported by our unanimous holding[14] in *Bowen, supra.* In that case we rejected the Government's contention that two sections of the Social Security Act, 42 U. S. C. § 301 *et seq.* (1982 ed.), barred judicial review of the validity of a regulation governing the payment of Medicare benefits. We recognized that review of

---

[14] Then-JUSTICE REHNQUIST did not participate in the case.

individual determinations of the amount due on particular claims was foreclosed, but upheld the collateral attack on the regulation itself, emphasizing the critical difference between an individual "amount determination" and a challenge to the procedures for making such determinations:

> "The reticulated statutory scheme, which carefully details the forum and limits of review of 'any determination . . . of . . . the amount of benefits under part A,' 42 U. S. C. § 1395ff(b)(1)(C) (1982 ed., Supp. II), and of the 'amount of . . . payment' of benefits under Part B, 42 U. S. C. § 1395u(b)(3)(C), simply does not speak to challenges mounted against the *method* by which such amounts are to be determined rather than the *determinations* themselves. As the Secretary has made clear, 'the legality, constitutional or otherwise, of any provision of the Act or regulations relevant to the Medicare Program' is not considered in a 'fair hearing' held by a carrier to resolve a grievance related to a determination of the amount of a Part B award. As a result, an attack on the validity of a regulation is not the kind of administrative action that we described in *Erika* as an 'amount determination' which decides 'the amount of the Medicare payment to be made on a particular claim' and with respect to which the Act impliedly denies judicial review. 456 U. S., at 208." 476 U. S., at 675–676 (emphasis in original).

Inherent in our analysis was the concern that absent such a construction of the judicial review provisions of the Medicare statute, there would be "no review at all of substantial statutory and constitutional challenges to the Secretary's administration of Part B of the Medicare program." *Id.*, at 680.

As we read the Reform Act and the findings of the District Court, therefore, this case is controlled by *Bowen* rather than by *Heckler*. The strong presumption in favor of judicial review of administrative action is not overcome either by the

language or the purpose of the relevant provisions of the Reform Act.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA joins, dissenting.

Congress has carefully limited the judicial review available under the Immigration Reform and Control Act of 1986 (Reform Act) in language which "he who runs may read." The Court, with considerable and obvious effort, finds a way to avoid this limitation, because to apply the statute as written could bar judicial review of respondents' constitutional claims. The statute as written is, in my view, constitutional, and there is therefore no need to rewrite it.

I

The relevant provisions of the Reform Act dealing with administrative and judicial review are found in 8 U. S. C. § 1160(e):

"(1) Administrative and judicial review

"There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.

"(2) Administrative review

"(A) Single level of administrative appellate review

"The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of such a determination

.          .          .          .          .

"(3) Judicial review

"(A) Limitation to review of exclusion or deportation

"There shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation under section 1105a of this title."

The first of the quoted sentences states, as clearly as any language can, that judicial review of a "determination respecting an application for adjustment of status under this section" may not be had except in accordance with the provisions of the subsection. The plain language of subsection (3)(A) provides that judicial review of a denial may be had only in connection with review of an order of exclusion or deportation. The Court chooses to read this language as dealing only with "direct review of individual denials of SAW status, rather than as referring to general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Ante*, at 492. But the accepted view of judicial review of administrative action generally— even when there is no express preclusion provision as there is in the present statute—is that only "final actions" are reviewable in court. The Administrative Procedure Act provides:

> "[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U. S. C. § 704.

The Court's reasoning is thus a classic non sequitur. It reasons that because Congress limited judicial review only of what were in effect final administrative decisions, it must not have intended to preclude separate challenges to procedures used by the agency before it issued any final decision. But the type of judicial review of agency action which the Court finds that Congress failed to preclude is a type not generally available even without preclusion. In the light of this settled rule, the natural reading of "determination respecting an application" in § 1160(e) encompasses both final decisions and procedures used to reach those decisions. Each of respondents' claims attacks the process used by Immigration and

Naturalization Service (INS) to make a determination respecting an application.

We have on several occasions rejected the argument advanced by respondents that individual plaintiffs can bypass restrictions on judicial review by purporting to attack general policies rather than individual results. For instance, in *United States* v. *Erika, Inc.*, 456 U. S. 201 (1982), we found that in the context of the "precisely drawn provisions" of the Medicare statute, the provision of judicial review for awards made under Part A of the statute, coupled with the omission of judicial review for awards under Part B, "provides persuasive evidence that Congress deliberately intended to foreclose further review of such claims." *Id.*, at 208 (citations omitted). Similarly, in *Heckler* v. *Ringer*, 466 U. S. 602 (1984), we addressed a challenge to a ruling issued by the Secretary of Health and Human Services that precluded payment under Medicare for a particular medical procedure. The Medicare Act permits judicial review of "any claim arising under" the Act, 42 U. S. C. §§ 405(g), (h), only after a claimant seeks payment and exhausts administrative remedies. The plaintiffs contended that their lawsuits challenging the Secretary's refusal to reimburse the procedure at issue were permissible without exhausting administrative remedies because they challenged only the Secretary's "'procedure' for reaching her decision," not the underlying decision on their particular claims. 466 U. S., at 614. We rejected this distinction, finding that "it makes no sense to construe the claims . . . as anything more than, at bottom, a claim that they should be paid for their . . . surgery." *Ibid.* This holding was based on the recognition that a contrary result would allow claimants "to bypass the exhaustion requirements of the Medicare Act by simply bringing declaratory judgment actions in federal court before they undergo the medical procedure in question." *Id.*, at 621. We expressly rejected the contention—also urged by the respondents here—that "simply because a claim somehow can be con-

strued as 'procedural,' it is cognizable in federal district court by way of federal-question jurisdiction." *Id.*, at 614.

It is well settled that when Congress has established a particular review mechanism, courts are not free to fashion alternatives to the specified scheme. See *United States* v. *Fausto*, 484 U. S. 439, 448–449 (1988); *Whitney National Bank* v. *Bank of New Orleans & Trust Co.*, 379 U. S. 411, 419–422 (1965). In creating the Reform Act and the SAW program, Congress balanced the goals of the unprecedented amnesty programs with the need "to insure reasonably prompt determinations" in light of the incentives and opportunity for ineligible applicants to delay the disposition of their cases and derail the program. The Court's ponderously reasoned gloss on the statute's plain language sanctions an unwarranted intrusion into a carefully drafted congressional program, a program which placed great emphasis on a minimal amount of paperwork and procedure in an effort to speed the process of adjusting the status of those aliens who demonstrated their entitlement to adjustment. "If the balance is to be struck anew, the decision must come from Congress and not from this Court." *Ringer, supra*, at 627.

## II

The Court bases its conclusion that district courts have jurisdiction to entertain respondents' pattern and practice allegations in part out of respect for the "strong presumption" that Congress intends judicial review of administrative action. *Ante*, at 498. This presumption, however, comes into play only where there is a genuine ambiguity as to whether Congress intended to preclude judicial review of administrative action. In this case two things are evident: First, in drafting the Reform Act, Congress did not preclude all judicial review of administrative action; as detailed earlier, Congress provided for judicial review of INS action in the courts of appeals in deportation proceedings, and in the district courts in orders of exclusion. Second, by enacting

such a scheme, Congress intended to foreclose all other avenues of relief. Therefore, since the statute is not ambiguous, the presumption has no force here.

The Court indicates that this presumption of judicial review is particularly applicable in cases raising constitutional challenges to agency action. *Ante*, at 496–499. I believe that Congress intended to preclude judicial review of such claims in this instance, and that in this context it is permissible for it to do so.

In the Reform Act, Congress enacted a one-time amnesty program to process claims of illegal aliens allowing them to obtain status as lawful residents. Congress intended aliens to come forward during the limited, 12-month eligibility period because "[t]his is the first call and the last call, a one-shot deal." 132 Cong. Rec. 33217 (1986) (remarks of Sen. Simpson). If an alien failed to file a legalization application within the 12-month period, the opportunity was lost forever. To further expedite this unique and unprecedented amnesty program and to minimize the burden on the federal courts, Congress provided for limited judicial review.

Given the structure of the Act, and the status of these alien respondents, it is extremely doubtful that the operation of the administrative process in their cases would give rise to any colorable constitutional claims. "'An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare.'" *INS* v. *Pangilinan*, 486 U. S. 875, 884 (1988) (quoting *United States* v. *Ginsberg*, 243 U. S. 472, 474 (1917)).

Respondents are undoubtedly entitled to the benefit of those procedures which Congress has accorded them in the Reform Act. But there is no reason to believe that administrative appeals as provided in the Act—which simply have not been resorted to by these respondents before suing in the

District Court—would not have assured them compliance with statutory procedures. The Court never mentions what colorable constitutional claims these aliens, illegally present in the United States, could have had that demand judicial review. The most that can be said for respondents' case in this regard is that it is conceivable, though not likely, that the administrative processing of their claims could be handled in such a way as to deny them some constitutional right, and that the remedy of requesting deportation in order to obtain judicial review is a burdensome one. We have never held, however, that Congress may not, by explicit language, preclude judicial review of constitutional claims, and here, where that body was obviously interested in expeditiously processing an avalanche of claims from noncitizens upon whom it was conferring a substantial benefit, I think it may do so.