**BLUE BELL MEDICAL, INC., et al., Plaintiffs,**

v.

**PENNSYLVANIA BLUE SHIELD, in its capacity as Medicare Carrier, Louis W. Sullivan M.D., Secretary of Health and Human Services, Defendants.**

**Civ. A. No. 1:CV–91–1180.**

United States District Court, M.D. Pennsylvania.

Oct. 15, 1991.

---

David D. Queen, Carl T. Hedlund, Ober, Kaler, Grimes & Schriver, Baltimore, Md., for plaintiffs.

Michael J. Kane, Harrisburg, Pa., Lawrence J. Harder, H. Anthony Lim, Thomas W. Coons, Dept. of Health and Human Services, Office of General Counsel, Baltimore, Md., for defendants.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

We are currently considering the plaintiffs' petition for a writ of mandamus and the defendants' motion to dismiss or, in the alternative, for summary judgment.

The fifteen plaintiffs are providers of services within the meaning of Part B of the Medicare program. *See* 42 U.S.C. § 1395j–1395w. They filed this action to contest a recent unilateral decision by defendant, Pennsylvania Blue Shield (PBS), as a carrier for the program, to reduce its reimbursement for "primary surgical dressing kits" from $30.00 to $8.00. They alleged that this action violated their right to due process because it was contrary to 42 C.F.R. § 405.502(g), requiring a notice and comment period for certain rate changes. The complaint also set forth a second due process claim based upon the retroactive effect of the notice upon the price for kits already supplied.

In material part, the plaintiffs sought the following relief: (1) an injunction against any change in the payments for surgical dressing kits until the defendants had complied with the provisions of 42 C.F.R. § 405.502(g)(3)(ii) and, in particular, an injunction against the change announced by PBS on August 19, 1991; and (2) an order requiring that plaintiffs' claims be processed at the $30.00 rate and reimbursement for those processed at the new rate.

A motion for a preliminary injunction accompanied the complaint and a hearing was held on September 16, 1991. At the hearing, the plaintiffs withdrew their request for an injunction but argued that they were entitled to a writ of mandamus pursuant to 28 U.S.C. § 1361, ordering PBS to follow the procedure in section 405.-502(g). Thereafter, the defendants, PBS and Louis W. Sullivan, M.D., the Secretary of Health and Human Services, filed their

motion.[1]  The parties have briefed the issues and the motions are ready for disposition.

## II.  *Background.*

We take the following facts to be undisputed based upon the complaint, the record evidence, and the parties' briefs.

Part B of the Medicare program deals with medical services and supplies.  In the parlance of the statute, PBS is a "carrier" for the Secretary in the administration of Part B of the Medicare program.  42 U.S.C. § 1395u.  As a carrier, PBS is responsible for determining the "reasonable charge" for medical services covered by Medicare, including the charge for medical supplies such as surgical dressing kits.  *Id.;*  42 C.F.R. § 405.501(d)(1990).  It is also responsible for reimbursing suppliers.  By law, Medicare generally pays no more than 80% of the "reasonable charge" for services and supplies.  42 U.S.C. §§ 1395k(a)(1), 1395l(a)(1) and 1395x(s).

Prior to August 12, 1991, PBS reimbursed suppliers for surgical dressing kits at the rate of $30.00 per kit.  On August 19, 1991, it announced to supplier associations but not to suppliers directly, that the rate would be reduced to $8.00 per kit, retroactive to August 12, 1991, even for reimbursements already awaiting processing.  Subsequent to the hearing in this matter, in a notice, dated September 20, 1991, it purportedly notified suppliers of what it deemed to be the appropriate content of each kit.  The notice further stated: "If a kit containing items beyond those listed above is furnished, those items should be billed in addition to the standard kit and accompanied by documentation substantiating their medical need." (defendants' motion, exhibit 3).  This notice was consistent with representations made at the hearing that the $8.00 rate was not a fixed one and that suppliers could be reimbursed for kits actually worth more than that.  It

was, however, the earlier, unilateral decision to reduce the rate that prompted the plaintiffs to file this lawsuit.  As noted, they believed it violated their right to notice and a period of time to comment on the proposed change before the rate was altered.

## III.  *Discussion.*

### A.  Jurisdiction.

█  The defendants argue that we lack jurisdiction to entertain this lawsuit.  In their view, the plaintiffs' complaint presents claims arising under the Medicare Act[2] which must first be presented to the carrier and the agency before judicial review is available.  A direct lawsuit like the present one has not been authorized by Congress.  Among other cases, defendants cite as their principal support *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) and *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).  Plaintiffs counter with *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) as support for the exercise of our jurisdiction.  In turn, defendants assert that *Michigan Academy* is no longer good law in the context of challenges involving Part B of the Medicare program in light of *McNary v. Haitian Refugee Center, Inc.,* — U.S. —, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).

We have carefully examined the cases cited by the parties and we conclude that we have jurisdiction to entertain the complaint.  Discussion of each decision is not necessary.  The Supreme Court cases cited by the parties provide the necessary guidance.  They are all consistent in their legal analysis and differ only because they present different facts.  Contrary to defendants' position, *McNary* does not diminish the authority of *Michigan Academy* and, in fact, provides further support for the conclusion that we have jurisdiction here.

---

**1.**  We will consider the motion one for summary judgment rather than to dismiss because its resolution will depend upon matters outside the complaint.

**2.**  The Medicare Act is Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*  Aside from Part B, the other main division of the Medicare Act is Part A, 42 U.S.C. §§ 1395–1395i–4.

The jurisdictional issue arises because the Medicare Act incorporates by way of 42 U.S.C. §§ 1395ff and 1395ii, the method of administrative and judicial review found in 42 U.S.C. §§ 405(h) and 405(g). Section 1395ii provides that section 405(h) shall apply to Medicare determinations. Section 405(h) provides in full that (emphasis added):

> The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.*

At the same time, section 1395ff(b)(1)(C) and (D) generally provide, in pertinent part, that "[a]ny individual dissatisfied with any determination under subsection (a) of this section as to ... the amount of benefits under part A or part B of this subchapter ... or ... any other denial ... of a claim for benefits under part A of this subchapter or a claim for benefits with respect to home health services under part B of this subchapter" shall be entitled to a hearing by the Secretary "and to judicial review of the Secretary's final decision ... as is provided in section 405(g)...."

Thus, as the defendants correctly point out, for claims arising under the Act, the Secretary must first reach a final decision—which is then subject to judicial review. Since the plaintiffs have admittedly not attempted first to seek redress from the carrier or the Secretary,[3] but instead filed suit in this court, the defendants argue that we have no jurisdiction to entertain the lawsuit.

The correctness of this argument, however, depends upon whether the plaintiffs' claims in the instant case arise under the Medicare Act. Under the authority of *Michigan Academy* and *McNary*, we believe that the claims do not and that we have jurisdiction under section 1331.

In *Michigan Academy*, physicians challenged a regulation that compensated them differently from board certified physicians for the same services provided under Part B of the Medicare program. The district court and the court of appeals upheld their challenge while dismissing the Secretary's contention that jurisdiction was absent.

On certiorari, the Supreme Court held that the lower courts had correctly decided the jurisdictional issue. It first noted that, absent persuasive evidence to the contrary, there was a strong presumption in favor of judicial review of administrative actions. It then rejected the Secretary's contention that sections 1395ff and 1395ii precluded jurisdiction of any agency action taken in connection with Part B of the Medicare program. It noted that the situation was somewhat complex because section 1395ff—at that time—provided only carrier review of determinations under Part B while permitting administrative and judicial review of Part A determinations. Nevertheless, it concluded that section 1395ff did not bar the lawsuit because the section dealt only with the amount of benefits. Such a determination "simply does not speak to challenges mounted against the method by which such amounts are to be determined rather than the determinations themselves." 476 U.S. at 675, 106 S.Ct. at 2138, 90 L.Ed.2d at 631 (emphasis in original) (distinguishing *United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982)).

The Supreme Court's jurisdictional analysis is in accord with the recent decision in *McNary, supra*. *McNary* was a direct constitutional challenge in district court to regulations governing proceedings by the Immigration and Naturalization Service (INS) under the "Special Agricultural Workers" (SAW) amnesty program, which granted certain rights to certain illegal aliens seeking citizenship. The question presented was whether section 210(e) of the Immigra-

---

**3.** The process provides that a claimant dissatisfied with a carrier determination can obtain review before a hearing officer chosen by the carrier. *See* 42 C.F.R. §§ 405.821 and 405.823.

tion and Nationality Act (INA), codified at 8 U.S.C. § 1160(e), precluded federal question jurisdiction. Section 210(e)(1) provided that "[t]here shall be no ... judicial review of a determination respecting an application for adjustment of status ... except in accordance with this subsection." (brackets added). Section 210(e)(3)(A) provided judicial review of the denial of SAW status "only in the judicial review of an order of exclusion or deportation."

The Supreme Court held that the section did not bar jurisdiction over the lawsuit. Among other things, the Court noted that both sections referred to judicial review of a "determination" while the lawsuit was a general challenge to procedures used in those determinations.

The Court in *McNary* also distinguished *Ringer, supra*, one of the defendants' main cases in the instant action. In *Ringer*, the plaintiffs sought an injunction—not damages or an award of benefits—ordering the Secretary to declare a surgical procedure to be covered under Part A of the Medicare Act, contrary to the Secretary's then stated policy that the procedure was not covered. Three of the four plaintiffs had already had the procedure and the fourth was anticipating it. The Supreme Court held that there was no jurisdiction over the litigation because it was "at bottom" a claim that they should be paid for their surgeries. *McNary*, —— U.S. at ——, 111 S.Ct. at 897, 112 L.Ed.2d at 1019 (quoting *Ringer*). To have granted the plaintiffs the relief they sought would have had "the practical effect of also deciding their claims for benefits on the merits." *McNary*, —— U.S. at ——, 111 S.Ct. at 897, 112 L.Ed.2d at 1019.

In *McNary*, on the other hand, the plaintiffs were only seeking to change the procedures to be followed in determining SAW status. As stated by the Court:

Unlike the situation in [*Ringer*] the individual respondents in this action do not seek a substantive declaration that they are entitled to SAW status. Nor would the fact that they prevail on the

merits of their purportedly procedural objections have the effect of establishing their entitlement to SAW status. Rather, if allowed to prevail in this action, respondents would only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures.

*Id.* at ——, 111 S.Ct. at 898, 112 L.Ed.2d at 1020 (brackets added).

Similarly, in the instant case, the plaintiffs do not seek a declaration that they are entitled to a rate of $30.00 per surgical dressing kit nor would their procedural objections to the manner in which the new rate was implemented have that effect. If the plaintiffs prevailed in this action, all they would obtain would be a right to notice and comment before any new rate went into effect.[4] The other case cited by defendants, *Salfi, supra*, is distinguishable for the same reason. This case does not present claims arising under the Medicare Act and we have jurisdiction.

It is also apparent from the foregoing discussion that the distinction the defendants would draw between this case and *Michigan Academy* on the basis of the current availability of judicial review of Part B claims is irrelevant. In fact, *Michigan Academy* itself rebuts it. It is true that such review procedures were absent in *Michigan Academy* but it was not a crucial factor in that case because *Michigan Academy*, like the instant action, was not concerned with challenges to determinations under the Act. Hence, it was irrelevant whether such determinations were judicially reviewable or not. We turn now to the merits of the petition for a writ of mandamus.

**B. Mandamus Relief.**

A petition for a writ of mandamus may be issued only when the following conditions have been met: "(1) that the petitioner have no other adequate means to attain the desired relief, and (2) that he show a clear and indisputable right to the relief

---

**4.** The complaint did request that we restore the old rate but only pending compliance with the procedure set forth in the regulation. We therefore view that request as ancillary to the main relief sought in this action. *See Ellis v. Blum*, 643 F.2d 68, 82 (2d Cir.1981).

sought." *DeMasi v. Weiss*, 669 F.2d 114, 117 (3d Cir.1982).

The plaintiffs have satisfied the first condition. Even if they submit individual claims for reimbursement to carrier hearing officers and then to the Secretary, they will not be able to obtain in those proceedings the relief they seek here—compliance with the notice and comment requirements of section 405.502(g). All they will be able to obtain is adjustment of individual claims. Further, we have not been presented with any other available means of relief.

We conclude, however, that the plaintiffs have not established a clear and indisputable right to an order requiring the carrier to provide notice in accord with the regulation.[5]

Plaintiffs contend that the following regulation is applicable to their situation and that PBS has failed to comply with it. In pertinent part, 42 C.F.R. § 405.502(g) provides as follows:

> (g) *Determination of reasonable charges in special circumstances: General*.... a carrier may establish special reasonable charge limits for a category of service if it determines that the standard rules for calculating reasonable charges set forth in this subpart result in grossly deficient or excessive charges. The limit on the reasonable charge is an upper limit to correct a grossly excessive charge or a lower limit to correct a grossly deficient charge. The limit is either a specific dollar amount, or is based on a special method to be used in determining the reasonable charge.
>
> . . . .
>
> (3) *Notification of limits—*(i) *National limits.*
>
> . . . .
>
> (ii) *Carrier level limits.* After September 9, 1988, a carrier proposing to establish a generally applicable special reasonable charge limit must inform the affected suppliers and State Medicaid

agencies of the factors considered in establishing the limit as described in paragraphs (g)(1) and (2) of this section and solicit comments. After evaluating the comments received, the carrier must inform the affected suppliers and State Medicaid agencies of any final limit established. The limit is effective for services furnished no fewer than 30 days after the date of the carrier's notification.

It appears from a reading of this regulation that it sets forth a procedure by which a carrier can establish "a generally applicable special reasonable charge limit" because the "standard rules for calculating reasonable charges" result "in grossly deficient or excessive charges." When a carrier decides to establish such a special reasonable charge, it must give notice and consider comments from suppliers and wait for thirty days after notice before putting the new rate into effect.

The only evidence at the hearing concerning the relevance of this regulation to PBS's new $8.00 rate for surgical dressing kits was elicited from Tammy Mohney, the Director of Medicare Provider Reimbursement for PBS. She testified that the old rate of $30.00 was put into effect by mistake, not by following the standard rules for establishing reasonable charges. Prior to February of 1986, the reimbursement code for primary surgical dressing kits— A4555—designated simply primary surgical dressings. The latter dressings were reimbursed at a $30.00 rate. In February of 1986, as part of a national coding change, the Health Care Financing Administration (HCFA), the federal body responsible for the administration of the Medicare program, began to use A4555 to designate primary surgical dressing kits. Unfortunately, at that time, PBS began to reimburse for kits at the same rate it reimbursed for the surgical dressings, without giving any thought to whether the $30.00

---

**5.** 28 U.S.C. § 1361 provides the district courts with mandamus jurisdiction "to compel any officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Plaintiffs have argued, and defen-

dants have not disputed, that PBS is subject to mandamus because it acts as the Secretary's agent in the administration of the Medicare program.

rate was a reasonable charge for a kit. (N.T. 12–16).

PBS did not discover its error until Spring of 1991. It then began to investigate an appropriate charge for primary surgical dressing kits. (N.T. 21). The new $8.00 rate announced to supplier associations in August of 1991 was the result.

Based upon the foregoing testimony, the defendants contend that section 405.502(g) does not apply here. The regulation requires notice and comment when a supplier decides that a rate should be changed because "the standard rules for calculating reasonable charges ... result in grossly deficient or excessive charges." In the instant case, however, the old rate for primary surgical dressing kits had not been set according to the "standard methodology." (N.T. 24). Rather, that evaluation under the standard rules occurred for the first time in 1991. Hence, the regulation is inapplicable and PBS cannot be compelled to give notice and comment.

Plaintiffs do not contest that this is what happened. They have not provided evidence, for example, to show that, in fact, the standard rules were followed. Their only response to PBS's position on the factual background to the rate change is that the carrier should not be allowed some five years after it began to reimburse surgical dressing kits at the rate of $30.00 to change the rate unilaterally by declaring that the initial rate was just a mistake. They point out that it had a duty in the first instance to set an "inherently reasonable" rate using criteria set forth in section 405.502(a). In their view, it is now too late for PBS to do anything except follow the procedure set forth in section 405.502(g) for changing the rate.

■ Plaintiffs have not used the word, but in our view, they are in effect asserting that PBS should now be "estopped" from taking the position that the old rate was set by mistake. Estoppel may be available against the government but the Third Circuit has set forth certain conditions upon its use. *See Monongahela Valley Hospital, Inc. v. Sullivan,* 945 F.2d 576 (3d Cir. 1991). The plaintiffs' memoranda do not

address those conditions and we accordingly do not believe that a mere mistake on the part of a carrier is sufficient for us to conclude that it cannot now engage in the type of analysis it should have done initially to set the reasonable charge.

It follows from this conclusion that the petition for a writ of mandamus must be denied. The rate for primary surgical dressing kits was not in the first instance calculated using the standard rules and the regulatory provision the plaintiffs are depending on comes into play only when the standard rules result in grossly excessive or deficient charges. The testimony of Charles Spalding, an official with the HCFA, buttresses this conclusion. We must afford his interpretation great deference since it comes from a member of the agency that promulgated the regulation. *See Monongahela Valley Hospital, supra.*

Plaintiffs' reply brief to the defendants' motion for summary judgment argues at great length that PBS's manner of changing the rate for primary surgical dressing kits was grossly unfair and inequitable. The change was made unilaterally and without prior notice to the suppliers who could not then provide input into the decision. The plaintiffs argue that, without that input, PBS's redefinition of the items in a kit to reach an $8.00 reasonable charge was arbitrary.

They assert that all of this went against the purpose of section 505.405(g). They quote from the Federal Register portions of the preambles to the first draft of the regulation and its final form which would support their broad interpretation of the regulation as applying any time after a rate has been put into effect. Thus, as explained in the Federal Register, the regulation was intended to provide "limits that are well-conceived, reasonable, and properly documented ...," 51 Fed.Reg. 5727 (Feb. 18, 1986), and was promulgated to "follow the language and spirit" of recent amendments to the Medicare program. 51 Fed.Reg. 5726 (Feb. 18, 1986). HCFA also explained that "[b]ecause of congressional and industry concern ... we are specifying in this rule ... a requirement that carriers, in the future, obtain comments from affected groups on every proposed general appli-

cation of their inherent reasonableness authority." 51 Fed.Reg. 28715 (Aug. 11, 1986).

Plaintiffs also argue that the portions of the Medicare Carriers Manual that Mohney relied upon, §§ 2100.2C, 5003 and 5248, to justify the calculations leading to the $8.00 charge are not applicable to the instant case. Section 5248, for example, dealt with the calculation of reasonable charge determinations for physician services, not medical supplies.

They further argue that if we countenance what PBS did here, carriers will be able to exempt themselves from using the standard rules to set reasonable charges by simply not following the rules in the first place. The regulation will then become a way of evading a principled calculation of charges rather than a means of limiting the carrier's discretion.

All of this has some appeal, but we must remember that plaintiffs are asking us to compel the defendants to follow a specific regulation, one which on its face does not apply to an initial determination of reasonable charges and only applies when the standard rules do not provide an inherently reasonable charge. That regulation does not apply to the current situation and we cannot compel its use here by the defendants.

Thus, it is immaterial that Mohney cited portions of the Carriers Manual that were not specifically applicable to the primary surgical dressing kit charge or to the point she was attempting to make about how that charge was calculated. In these mandamus proceedings, she did not have such a burden. Rather, the plaintiffs had to show a clear and indisputable right to compliance with the provisions of the regulation.

We are also not convinced by the plaintiffs' citations to the Federal Register. The quoted statements, taken in context, are limited by other explanations in the preambles clearly limiting the regulation to changes in reasonable charges when the carrier determines that the standard rules have resulted in grossly deficient or excessive charges.

It may be that a regulation allowing notice and comment for any change in rates should be adopted, but HCFA has not done

so, and plaintiffs have not cited any authority permitting us to order it to do so, or to provide them with that relief as it relates to this case.

As noted, the defendants have moved for summary judgment. Plaintiffs have vigorously protested the filing of the motion, contending that the only issue before the court is the propriety of the mandamus request. We see nothing improper about the motion. Fed.R.Civ.P. 56(b) provides that a defendant may move for summary judgment "at any time." Plaintiffs have not asserted that additional time is needed for discovery or otherwise to prepare their case. Based upon the foregoing, it therefore appears that summary judgment would be appropriate on the claim that the defendants failed to comply with section 405.502(g). We hesitate, however, to enter summary judgment on the entire complaint. As noted, the plaintiffs also alleged that the retroactive application of the new rate to requests for reimbursement submitted prior to August 12, 1991, violated property interests protected by due process. The defendants' motion did not address that claim. Accordingly, judgment will be entered only on the claim involving the regulation.