AYUDA, INC., et al.

v.

**Janet RENO, Individually and as Attorney General of the United States, et al., Appellants (Two Cases).**

**AYUDA, INC., et al., appellants,**

v.

**Janet RENO, et al.**

Nos. 88–5226, 90–5293 and 89–5301.

United States Court of Appeals, District of Columbia Circuit.

Decided Oct. 26, 1993.

Before: WALD, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge WALD.

SILBERMAN, Circuit Judge:

This case is returned to us by the Supreme Court for the second time. —— U.S. ——, 113 S.Ct. 3026, 125 L.Ed.2d 714. The Supreme Court vacated and remanded our first opinion, *Ayuda, Inc. v. Thornburgh,* 880 F.2d 1325 (D.C.Cir.1989), and asked us to reconsider the issues presented in light of its opinion in *McNary v. Haitian Refugee Cen-*

*ter, Inc.*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). We did so, and reiterated our view that the district court lacked jurisdiction to entertain a suit brought to challenge a supposed Immigration and Naturalization Service (INS) interpretation of a regulation governing the manner in which legalization decisions were made under the Immigration Reform and Control Act of 1986 (IRCA), Pub.L. No. 99–603, 100 Stat. 3359 (1986). *Ayuda, Inc. v. Thornburgh*, 948 F.2d 742 (D.C.Cir.1991). We are again asked to consider our opinion in the aftermath of *Reno v. Catholic Social Servs., Inc.*, —— U.S. ——, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (*CSS*). After carefully examining *CSS*, we stand by our conclusion that the district court lacked jurisdiction in this case, and hence, we decline to remand to the district court as plaintiffs urge.

## I.

As we described in our first opinion, this litigation—directed at the INS' administration of the special one-time IRCA amnesty program—came on the heels of a developing line of cases in which aliens, or organizations representing aliens, sought to supplement courts of appeals review of INS deportation orders under 8 U.S.C. § 1105a with actions brought in the district court challenging generic INS policies before they were applied in deportation proceedings. *Ayuda*, 880 F.2d at 1335–36. Such a lawsuit, particularly when brought by an organizational plaintiff or by a class, permits aliens to challenge INS policies in federal court without the risk of identification and consequent deportation if they should lose.[1] Our case, brought by five aliens and four organizational plaintiffs (so-called Qualified Designated Entities (QDEs) who are authorized to serve as intermediar-

ies between aliens and the INS), focused only on the particular judicial review provisions of IRCA. We held that the district court lacked jurisdiction to hear the plaintiffs' challenge to an asserted interpretation of an INS regulation that defined the statutory term "known to the government."[2]

We concluded that the district court lacked jurisdiction on two separate grounds. First, we thought that the statutory review provisions, which provide for exclusive review in the courts of appeals for all deportation orders,[3] precluded a district court challenge to any formal or informal manifestation of the INS' construction of aliens' substantive rights under the statute. *Ayuda*, 880 F.2d at 1333–40. Second, we determined that INS had not yet decided whether the absence of quarterly reports in an alien's INS file put the government on constructive notice that the alien's illegal status was "known to the government". Thus, even if the district court enjoyed statutory jurisdiction, the case was not yet ripe. *Ayuda*, 880 F.2d at 1343. We did not reach the government's challenge to the standing of organizational plaintiffs upon which the district court had premised "plaintiffs'" standing. *Ayuda*, 880 F.2d at 1339–40.

Subsequently, the Supreme Court in *McNary* held that district courts did have jurisdiction to entertain a constitutional and statutory challenge to the INS' alleged failure to provide due process in the administration of another portion of the amnesty program. The INS had been accused of depriving applicants of an opportunity to challenge material evidence, to present witnesses, and to employ competent interpreters, and the Court concluded that Congress did not mean to limit judicial review to the court of appeals in such a case. *McNary v. Haitian Refugee*

---

1. Under IRCA's amnesty program, the INS cannot use information contained in an application for amnesty against the applicant. *See* 8 U.S.C. § 1255a(c)(5).

2. Only aliens whose illegal status in the United States was "known to the government" are entitled to amnesty under the program.

3. Section 1255a(f)(1) states: "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of

status under this section except in accordance with this subsection." 8 U.S.C. § 1255a(f)(1). Section 1255a(f)(4)(A) states: "[t]here shall be judicial review of such a denial only in the judicial review of an order of deportation under section 1105a of this title." 8 U.S.C. § 1255a(f)(4)(A). Section 1105a, in turn, asks us to look at title 28, chapter 158, to ascertain how all review of deportation orders will proceed. 8 U.S.C. § 1105a. Chapter 158 grants jurisdiction to the courts of appeals. 28 U.S.C. § 2342.

*Center, Inc.,* 498 U.S. at 487–88, 494, 111 S.Ct. at 893–94, 897.

On remand, we sought to reconcile what we thought were conflicting currents in the Supreme Court's opinion. On the one hand, the Court's language did appear to restrict the phrase "a determination respecting an application"—on which court of appeals jurisdiction is fixed—to "an individual denial of ... status" and not a "group of INS decisions." 498 U.S. at 492, 111 S.Ct. at 896. Still we did not think the IRCA judicial review provisions could reasonably be construed to permit two or more aliens to sue freely in the district court, if one alien would be limited presumably to the court of appeals. *See Ayuda,* 948 F.2d at 749 n. 5. Instead, we concluded that the Supreme Court meant *McNary* to stand as an exception to the exclusive court of appeals review of INS legalization determinations (after deportation orders) for collateral procedural challenges if the administrative record would be inadequate to support appellate review of those issues in the courts of appeals. If, instead, aliens were seeking review of INS interpretations of IRCA—which the plaintiffs in our case clearly were—the district court lacked jurisdiction.

We rejected the notion that to force any alien to come forward and provoke a deportation order as a prerequisite to challenging his or her denial of legalization would amount to a "complete denial of judicial review for most undocumented aliens," *McNary,* 498 U.S. at 497, 111 S.Ct. at 898, and therefore should be thought "inadequate" within the meaning of *McNary*'s holding. We did so because otherwise we would have either ignored the statutory scheme for exclusive court of appeals jurisdiction in cases involving a "determination respecting an application" or been faced with what seemed an impossible analytic task of drawing a boundary between the jurisdiction of the district court and courts of appeals in cases challenging INS' substantive interpretation of IRCA. *See Ayuda,* 948 F.2d at 753; 958 F.2d 1089, 1092–93

(D.C.Cir.1992) (Silberman, J., concurring in the denial of rehearing *en banc* ).

In addition, we reiterated our view that the plaintiffs' challenge was unripe (the INS still had not resolved the "known to the government" issue) and we once again reserved the issue of the QDEs standing. *See Ayuda,* 958 F.2d at 1093 (Silberman, J., concurring in the denial of rehearing *en banc* ).

The Supreme Court then granted *certiorari* in *CSS,* a case in which the Ninth Circuit read *McNary* contrary to the way we did.[4] While a petition for *certiorari* in *Ayuda* was pending before the Supreme Court, the Solicitor General notified the Court that the INS had recently arrived at an agency position as to whether the absence of documents from government files indicated that the alien's illegal status was known to the government. Hence, the particular ripeness ground upon which we had relied was no longer present.

The Court handed down *CSS* this summer and subsequently vacated our decision (along with several cases that disagreed with our opinion) for reconsideration in light of *CSS.* We then asked the parties for their views. Perhaps understandably in light of their long litigation struggle, the plaintiffs and the government disagree both as to the meaning of *CSS* and as to the appropriate next step in our case. The plaintiffs argue that "[b]ecause the generic challenges in *Ayuda* can be resolved without referring to or relying on the denial of any individual application (as indeed they were resolved by the district court), the district court may properly exercise jurisdiction over plaintiffs' challenges." The government argues that the district court lacked jurisdiction as the plaintiffs challenged INS' substantive regulations, rather than collateral procedures.

We think plaintiffs badly misread the Supreme Court's opinion. *CSS* confirmed the plaintiffs' view of *McNary*'s construction of section 1255a(f)(1) as applying only to the denial of a single application. But the Court, noting that federal courts have been reluctant to apply injunctive and declaratory judgment remedies to administrative determina-

---

4. The Seventh Circuit, *Morales v. Yeutter,* 952 F.2d 954 (7th Cir.1991), and Second Circuit, *Perales v. Thornburgh,* 967 F.2d 798 (2d Cir.

1992), had also held that an INS regulation was directly reviewable in district court.

tions[5] unless these arise in the context of a controversy "ripe" for judicial resolution, elaborated and extended the general ripeness doctrine of *Abbott Laboratories v. Gardner,* 387 U.S. 136, 152–54, 87 S.Ct. 1507, 1517–18, 18 L.Ed.2d 681 (1967), and *Lujan v. National Wildlife Federation,* 497 U.S. 871, 891, 110 S.Ct. 3177, 3190, 111 L.Ed.2d 695 (1990), so as to severely limit *McNary, see CSS,* ⸺ U.S. at ⸺ ⸺, 113 S.Ct. at 2495–96, and thus neatly came, by a somewhat modified route, to our resolution of the boundary issue. The Court held that a putative beneficiary under a statute such as the amnesty program does not have a ripe claim merely when an agency publishes a regulation that might bear on his right to the benefit. *CSS,* ⸺ U.S. at ⸺, 113 S.Ct. at 2496. The claimant must at least apply and be denied the benefit before the claim ripens. Typically, when the claimant is denied the benefit, the claim is then ripe for adjudication.[6] *Id.*

Under IRCA, as the Supreme Court observed, an alien who is denied legalization is subject to the exclusive administrative and judicial review provisions of that statute. His claim may, in general terms, be thought ripe, yet the statute directs him exclusively to the court of appeals and only on a review of a deportation order.[7]

Although the Supreme Court initially rejected our construction of the statutory jurisdiction provisions, it ultimately came very close to affirming our holding by seeming to rely on those same provisions:

> The ripeness doctrine and the Reform Act's jurisdictional provisions would thus dovetail neatly, and not necessarily by mere coincidence. Congress may well

have assumed that, in the ordinary case, the courts would not hear a challenge to regulations specifying limits to eligibility before those regulations were actually applied to an individual, whose challenge to the denial of an individual application would proceed within the Reform Act's limited scheme.

*CSS,* ⸺ U.S. at ⸺, 113 S.Ct. at 2485.

The Court also agreed with our reading of *McNary,* limiting its reach to situations in which plaintiffs raised "procedural" objections that could not receive "practical judicial review within the [statutory] scheme." *Compare CSS,* ⸺ U.S. at ⸺, 113 S.Ct. at 2497 *with Ayuda,* 948 F.2d at 753.[8] At the end of the day, then, the Supreme Court conclusively foreclosed all efforts to gain federal district court review of INS interpretations of IRCA. Jurisdiction of the federal district courts could be invoked, as in *McNary,* only when it is necessary to supplement or aid ultimate court of appeals review under section 1255a(f)(1).

## II.

In *CSS* the Supreme Court remanded the case to the Ninth Circuit with instructions to remand, in turn, to the district court. The plaintiffs ask us also to remand this case to the district court. We decline to do so. In *CSS,* the Supreme Court noted that plaintiffs had alleged that members of the certified class actually tried to file applications for legalization and had been turned away—arguably pursuant to an INS Manual entry dealing with the subject. The Court thought this practice, described as "front-desking," if

---

**5.** We also had recognized the difficulties presented to administrative agencies when a plaintiff, instead of seeking review in the court of appeals of a single case, seeks a broad scale injunction in the district court. *See Ayuda,* 880 F.2d at 1330–31.

**6.** The Court's ripeness test calls into question the § 106 line of cases, *Ayuda,* 880 F.2d at 1335–36, insofar as they permit substantive legal challenges prior to an alien applying for a benefit.

**7.** The Court was unmoved by the argument that an alien should not have to risk identification in order to seek review and noted that the INS

represented that any alien who wished to secure review of his denial of legalization could "surrender ... for deportation." *CSS,* ⸺ U.S. at ⸺ n. 16, 113 S.Ct. at 2494 n. 16.

**8.** [W]e believe *McNary* holds that if the statutory administrative and judicial review scheme provides meaningful court of appeals review of an alien's legal claim, then Congress intended that scheme to be exclusive—ousting the district court of jurisdiction to hear the sort of claim at issue here. It is only when a collateral issue, typically a procedural practice, cannot be adequately presented to the courts of appeals that the exclusivity of section 1255a(f)(1) gives way. *Ayuda,* 948 F.2d at 753.

it had occurred, would fall under the *McNary* exception. *CSS*, —— U.S. at ——, 113 S.Ct. at 2499. If an alien tried to file an application within the one-year period Congress provided for seeking amnesty and was blocked by INS officials, there would be no record on which he could challenge the INS' refusal to grant him legalization. District courts would therefore have jurisdiction to ensure that such a person had his claim adjudicated by the INS. *Id.* That does not mean, of course, as plaintiffs contend, that district courts would have any power to consider "generic" or any other kind of substantive challenges to the INS' interpretation of IRCA. The *CSS* holding relying on the combination of general ripeness doctrine and the statutory review provisions precludes such an "end around play." *CSS*, —— U.S. at ——, 113 S.Ct. at 2497. On the contrary, the court suggested that relief would be limited to requiring the INS to adjudicate the claims. *See CSS*, —— U.S. at —— n. 29, 113 S.Ct. at 2500 n. 29.

Our case is quite different. Here there was no class certified. Plaintiffs sought class certification too late—after the district court's order had been appealed to this court, thus depriving the district court of jurisdiction—and, therefore, no class was ever certified. Hence, we only have five alien-plaintiffs and the organizations before us—not a class. Our dissenting colleague would nevertheless remand to the district judge to permit him now to certify a class if a search of the files of the special masters, appointed by the district judge to identify aliens who were discouraged from filing applications, revealed any that were front-desked.[9] At oral argument four years ago, appellants conceded that there were none, *Ayuda*, 880 F.2d at 1342, and we are confident that counsel would have brought any such to our attention long ago since we had indicated that those

persons would be entitled to relief. It is certainly not up to the court to search for a plaintiff upon whom to append a class certification, let alone to do so five years after the case was brought and after judgment in the case.

■ None of the named five plaintiffs alleged front-desking. Four never attempted to apply, and the fifth had an application accepted for processing. *CSS* makes clear, moreover, that the four organizational plaintiffs lack standing. The district court, it will be recalled, had determined otherwise; indeed, all of its orders, including the appointment of special masters to inquire into the situation of various aliens, were predicated on that determination. We had reserved the question of organizational standing, but it is now quite clear, in light of the *CSS* analysis, that the organizations did not have standing to raise their claims challenging INS policies or regulations that interpreted aliens' rights to legalization under IRCA. That is so because, as the Court reasoned, these claims may only be brought in court by individual aliens after the INS' statutory interpretation is applied to them, their application for legalization is denied, and they are subject to deportation orders. *CSS*, —— U.S. at ——, 113 S.Ct. at 2497. It follows then, that an organizational plaintiff could not undermine the statutory scheme by suing to challenge "generic" INS policies or statutory interpretations that bear on an alien's right to legalization. *See Block v. Community Nutrition Institute*, 467 U.S. 340, 345–48, 104 S.Ct. 2450, 2453–55, 81 L.Ed.2d 270 (1984). That means that the district judge should have dismissed the organizational plaintiffs from the suit.[10]

Nor do we perceive that the Supreme Court's treatment of the front-desking issue is any different than ours. We had similarly

---

9. The district judge appointed special masters after granting complete relief to the plaintiffs in an unusual effort to determine if there was anyone else who might be affected by his order.

10. The QDEs could not have had any connection to "front-desking," even had it occurred. As the Supreme Court made clear, front-desking could occur only if aliens came to an INS office with

an application completed and payment in hand, and were then turned away. *See CSS*, —— U.S. at —— n. 27, 113 S.Ct. at 2500 n. 27. Aliens who submitted applications with the assistance of QDEs, however, were allowed to skip review by Legalization Assistants who might front-desk applications. Hence, front-desking could only happen when QDEs had absolutely nothing to do with the submission of the application. *CSS*, —— U.S. at —— n. 21, 113 S.Ct. at 2498 n. 21.

concluded that if an alien had actually been "denied an opportunity even to file an application," the district court would have had jurisdiction under *McNary* for the limited purpose of ensuring that the INS adjudicated his application. *Ayuda,* 948 F.2d at 751. But, as we pointed out, "that is not this case; there was no evidence presented that any aliens (much less any of the five individual alien plaintiffs) were prevented from filing an application. *See Ayuda,* 880 F.2d at 1341–42." *Id.* And, the government assures us, without contradiction, that there is no manual entry involving the "known to the government" issue that could be thought to support a claim that front-desking occurred, and that Legalization Assistants at INS offices were instructed to accept all "known to the government" applicants. Our dissenting colleague argues that the Supreme Court has set forth a slightly more generous test in *CSS* because it suggested (in a footnote) the "unlikely possibility" that an alien who had been informed that others had been front-desked could show that "the front desking policy was nevertheless a substantial cause of their failure not [sic] to apply." *CSS,* —— U.S. at —— n. 28, 113 S.Ct. at 2500 n. 28. The Supreme Court's footnote, however, was premised on allegations of front-desking not present in our case. One could not very well be prevented from applying because of a non-existent policy or practice of front-desking.

Since there is not the slightest indication that any of the five plaintiffs in our case suffered a harm that would confer limited jurisdiction on the district court (such as front-desking), we see no justification in continuing this lawsuit.[11]

\*     \*     \*     \*     \*     \*

As we said over four years ago, what plaintiffs sought "was an advisory ruling on a potential theory for amnesty." *Ayuda,* 880 F.2d at 1346. They wished to evade IRCA's administrative and judicial review scheme by going directly to the district court. The

Supreme Court has now definitively determined that if plaintiffs wished to take advantage of the amnesty program, they were obliged to follow IRCA's procedures. For the foregoing reasons, we reiterate that the district court lacked jurisdiction to issue Supplemental Order V and to order the INS to grant work authorization to aliens who failed to file applications before the May 4, 1988 deadline. These orders are therefore *vacated.*

WALD, Circuit Judge, dissenting:

I agree with my colleagues that there is little left to this case after four years of appeals and two remands from the Supreme Court. Most of the 4000 illegal aliens who allegedly did not register for amnesty by the May 4, 1988 deadline because of misinformation received from INS agents or QDEs about their eligibility under the challenged INS "known to the government" regulations are now consigned to deportation or indefinite continuation of their shadow status. In *Reno v. Catholic Social Services, Inc.,* —— U.S. ——, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("*CSS*"), the Supreme Court decided that, except in a very minute category of cases, an undocumented alien's challenge to an INS regulation barring her eligibility for amnesty was not "ripe" unless she had tried unsuccessfully to apply for legalization and been turned away (even though the alien could not contest denial of legalization except by surrendering for deportation). The only cracks the Court left open for a front-end challenge were for those aliens who had been "front-desked," *i.e.,* whose applications had been turned away without filing by lower-level INS officials, or for those aliens who might come within the confines of the Court's footnote 28:

> Although we think it unlikely, we cannot rule out the possibility that further facts would allow class members who were not front-desked to demonstrate that the front-desking policy was nevertheless a

---

11. Of course, any other alien who could allege that he or she was actually "front-desked" might have a cause of action under the Administrative Procedure Act to compel INS to adjudicate his proferred application. *See* 5 U.S.C. § 706 ("The reviewing court shall ... compel agency action

unlawfully withheld or unreasonably denied."); *CSS,* —— U.S. at —— n. 29, 113 S.Ct. at 2500 n. 29 (noting that a front-desked individual had nevertheless "applied" within the meaning of the statute and could compel the INS to adjudicate that application).

substantial cause of their failure not [sic] to apply, so that they can be said to have had the [challenged regulations] applied to them in a sufficiently concrete manner to satisfy ripeness concerns.

*Id.* —— U.S. at —— n. 28, 113 S.Ct. at 2500 n. 28. The Court remanded to the trial court to identify any such eligible persons; other courts whose prior rulings, like ours, were vacated in light of *CSS*, have done likewise. *See Perales v. Thornburgh,* 4 F.3d 99, 100 (2d Cir.1993); *League of United Latin American Citizens v. INS,* 999 F.2d 1362 (9th Cir.1993); *Catholic Social Services, Inc. v. Reno,* 996 F.2d 221, 222 (9th Cir.1993).

My colleagues decline to follow that route, however, and it is from that determination that I dissent. I do not believe that on the extensive record before us, now spanning over five years, we can "rule out the possibility that further facts would allow class members who were not front-desked to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure not [sic] to apply," or the possibility that some of the thousands of aliens whose claims have been investigated by masters appointed by the district court were not actually front-desked. I would, therefore, remand for the identification process contemplated by the Court in *CSS*.

The objections my colleagues raise to pursuing that route are not persuasive. They say first that we have no certified class here as was the case in *CSS* and some of the other post-*CSS* remands; and further, since the original five plaintiffs in the *Ayuda* litigation and the organizational plaintiffs would not meet the *CSS* ripeness analysis so as to be eligible to continue the case, no one else can possibly maintain it.[1] The tortured procedural history of this action, however, does not lend itself to any such neat "over and out" solution. When Judge Sporkin made his de-

cision on March 30, 1988 that the INS's "known to the government" regulation was invalid (a decision the government chose not to appeal), he issued Supplemental Orders VII, IX, and X, which in tandem set up a procedure through which aliens who had not applied for amnesty because they were "not allowed or [were] dissuaded from filing an application by INS or its agents" could file statements with specially appointed masters about their reasons for not seeking legalization by May 4, 1988.[2] *Ayuda, Inc. v. Meese,* 687 F.Supp. 650 (D.D.C.1988) (Supplemental Order VII). The express purpose of this process was to identify aliens who had been deterred in any way from registering by the INS regulation or INS officials and to ascertain the nature and extent of their injury, so that appropriate remedies could be formulated. *See Ayuda, Inc. v. Meese,* 700 F.Supp. 49, 50 (D.D.C.1988). The aliens' statements were to detail for the masters the reasons why they had not registered by the statutory deadline. *See* 687 F.Supp. at 672–74 (reproducing court-ordered form requesting statement of reasons). Given this order, the critical factual foundation for whether any of the aliens who filed such statements are eligible under the "front-desking" exception or footnote 28 already exists in the masters' files below.

Moreover, as the majority notes, a class certification motion and a motion to add new plaintiffs as representatives of the class have been pending for several years. These motions have never been acted on by the district court. After Judge Sporkin announced his intention to retain jurisdiction over the case to formulate relief for individuals misled or prevented from applying by the INS (or QDEs), the original plaintiffs sought to amend their complaint to certify a class of persons who "failed to apply for legalization

---

1. I do agree that in light of the Supreme Court's analysis in *CSS*, the organizational plaintiffs would not likely have any standing, although we have never decided that issue expressly. I also would not rely on the original five plaintiffs in the *Ayuda* suit, four of whom alleged only that they did not file because they thought it "futile" and the fifth of whom actually filed, to represent any class created under the Supreme Court's new test.

2. The Memorandum Opinion accompanying Supplemental Order XI subsequently changed the wording to "individuals ... misled to their detriment by INS's erroneous interpretation and related government actions." *Ayuda, Inc. v. Meese,* 700 F.Supp. 49, 50 (D.D.C.1988).

prior to May 5, 1988 because they were dissuaded or misled ... [by] the INS or its agents ... or because they were not allowed to file or were dissuaded from filing an application by INS or its agents...." Plaintiffs' First Amended Complaint at 17–18. This original class certification motion was filed in September 1988 and renewed two years later. Judge Sporkin held the motion in abeyance pending completion of the masters' work. *See* 700 F.Supp. at 52.

A search of the masters' files would reveal whether any of the putative class members meets the new *CSS* ripeness test.[3] If such persons exist, it should not be too late for the court to rule on a certification motion to allow the action to continue. Rule 23(c)(1) requires a ruling on a class certification motion "[a]s soon as practicable after the commencement of an action." FED.R.CIV.P. 23(c)(1). The district court held the motion for class certification open pending the results of its special inquiry "to determine who the injured parties are and the extent to which their injuries were caused by the government's conduct and need to be remedied." *Ayuda,* 700 F.Supp. at 50. Although the words "as soon as practicable" are not without effect, "there is no set deadline by which the court must act." *Montelongo v. Meese,* 803 F.2d 1341, 1351 (5th Cir.1986) (decision to certify made three years after institution of suit), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2179, 95 L.Ed.2d 835 (1987); *see also Larionoff v. United States,* 533 F.2d 1167, 1183 n. 40 (D.C.Cir.1976) (citing Marvin E. Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39, 41–42 (1967)) ("[T]he time when a hard determination is 'practicable' as to the propriety of a class action will obviously vary from case to case.... [I]t may not be possible to decide

even tentatively near the outset of the case whether it should continue as a class action."), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). In light of the complexity of the legal and factual issues raised in this case and the labyrinthine route it has followed through the appellate courts, we should afford the district court considerable latitude with regard to matters of timing. Moreover, "although the question of the propriety of class certification after a judgment on the merits in favor of the class is a difficult one," *Postow v. OBA Federal Savings & Loan Ass'n,* 627 F.2d 1370, 1381 (D.C.Cir.1980), we have long recognized that "there may be equitable reasons for allowing post-judgment certification in some cases." *Id.* at 1383. Because of the singularly difficult posture of this case, and because strong considerations of equity should animate its resolution, I would give the district court an opportunity now to rule on a class certification motion that would accommodate the *CSS* test, if that proves feasible.

My colleagues also argue that our earlier opinions acknowledged that if any aliens claiming they were "known to the government" because of failure to file required reports under section 265, 8 U.S.C. § 1305 (1970), had actually been turned away from filing, they could have brought suit in the district court, but that no such cases were advanced. *See Ayuda, Inc. v. Thornburgh,* 948 F.2d 742, 751 (D.C.Cir.1991). Such persons, however, would not at the time have been plaintiffs in the suit, and their statements may not yet have been filed with the masters—or, if filed, may well have been buried among the 4000 stories in the masters' files. Moreover, non-section 265 aliens who would fall into the "front-desker" or

---

3. Throughout the diffuse record there are indications that such persons may exist. *See, e.g.,* Defendants' Opposition to Renewal of Plaintiffs' Motions for Leave to Amend Complaint and for Class Certification, Sept. 26, 1990, at 21 ("testimony ... show[s] wide variation as to whom [at INS] the aliens spoke to, what they said, and what was said to them"); Special Master's Report, Oct. 25, 1989, at 2 (identifiable class of aliens exists who did not file by the May 4, 1988 deadline because they were illegally dissuaded or misled by the INS); Transcript of Status Call, May 2, 1988, at 35–36 (statements that INS offi-

cers in two cities are not accepting applications for legalizing applicants eligible under the terms of the court's order); Bedor Affidavit, attached to Notice of Evidence of Defendants' Failure to Comply with the Court's Orders and Renewal of Request to Toll May 4, 1988 Filing Deadline at ¶ 10 (refusals to accept "known to the government" applications without fee despite order of the court); Tafoya Affidavit at ¶ 20 (applicants told by INS they were ineligible under "known to the government" criteria and declarant not aware INS kept records of such rejected applicants).

footnote 28 categories would have had little motivation to come forward in the section 265 portion of the case, since the earlier district court decision invalidating the "known to the government" regulation not involving section 265 aliens was never appealed. And although the government now asserts, as the majority points out, that "known to the government" applications were never "front-desked," this policy appears only to have been instituted after the March 30 decision by the district court invalidating the regulation.[4] The plaintiffs have had no opportunity to respond to that claim. *See* Plaintiffs' Response to July 7, 1993 Order at 9 (asserting need for review of applicants who were "front-desked" by the INS or a QDE or who fall within the scope of *CSS* footnote 28).

In addition, the test for eligibility to sue touched upon in earlier opinions was not precisely the one adopted by the *CSS* Court, years later. The majority found no evidence of the INS "literally closing the INS' office doors in aliens' faces." *Ayuda*, 948 F.2d at 751. The Supreme Court was a tad more generous, acknowledging the possibility that if the "front-desking policy was nevertheless a substantial cause of their failure not [sic] to apply, aliens might be eligible." *CSS*, —— U.S. at —— n. 28, 113 S.Ct. at 2500 n. 28. This new and somewhat broader test would now be the central focal point of the standing/ripeness inquiry in any continued litigation. It certainly was not so in the earlier rounds.

There is no doubt that this is the last act of the *Ayuda* drama. Given the narrowness of the exception left open by the Supreme Court and the ready availability of information as to whether any aliens within this exception exist, together with the pendency of a class certification motion for over five years that would include such persons and a motion to add new plaintiffs as class representatives, a remand to allow the plaintiffs to renew a class certification motion for persons registered with the masters who meet the *CSS* ripeness criteria seems the safe, humane, and legally correct thing to do.

I respectfully dissent from the panel's refusal to remand for that limited purpose.

---

**4.** *See* Press Release attached to Notice of Measures to be Taken in Response to Court's Order of March 30, 1988, Apr. 4, 1988 (new policy announced in *March 1988* permitting filing of "known to the government" applications).

My colleagues cite a "concession" at oral argument by plaintiffs' counsel almost five years ago that "at most, *some* local INS offices were informing aliens that the office would *recommend* denial of applications based on the section 265 theory." *Ayuda*, 880 F.2d at 1342 (cited in maj. at 251). We have no transcript of that argument, so it is not possible to evaluate in what context any such "concession" may have been made. I do note, however, that such a concession appears to be at odds with what the plaintiffs have said subsequently, *see* Plaintiffs' Response to July 7, 1993 Order at 9, and with other evidence in the record, *see* note 3 *supra*, and even on its own

terms does not apply to non-section 265 aliens who apparently had been front-desked prior to Judge Sporkin's March 30, 1988 order. *See, e.g.,* INS News Release, Apr. 11, 1988, attached to Supp.App. to Defendant–Appellants' Brief at 8 (No. 90–5293) (INS "will immediately *begin accepting* applications for legalization from some non-immigrant aliens in this country who were previously viewed as ineligible for the program.") (emphasis added); Affidavit of William S. Slattery, Assistant Commissioner, Legalization, Apr. 28, 1988 at ¶ 9, attached to Supp.App. to Defendant–Appellants' Brief at 2 (No. 90–5293) ("INS has not received any complaints that any Legalization Office or officer has *refused to accept* applications in the 'known to the Government' category, *since we have begun our efforts to publicize the court's orders* ") (emphasis added).