REVISED SEPTEMBER 9, 2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-51133

_____

JAVIER APARICIO, Individually and on
behalf of all persons similarly
situated; JUDITH RANGEL, Individually
and on behalf of others similarly situated;
ELISEO REALZOLA, Individually and on behalf
of others similarly situated,

                                        Plaintiffs-Appellants,

          versus

WILEY BLAKEWAY, In his official capacity;
KENNETH G. PASQUARELL, Director, in his
official capacity as District Director of
the Immigration and Naturalization Service
for the San Antonio Division; IMMIGRATION
AND NATURALIZATION SERVICE,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
August 15, 2002

Before GARWOOD, DEMOSS and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

     Plaintiff-appellants Javier Aparicio, Judith Rangel and Eliseo

Realzola filed this suit against the Immigration and Naturalization

Service (INS), and against Wiley Blakeway, the head of the San

Antonio INS Citizenship Branch, Kenneth Pasquarell, the Director of the San Antonio INS District, and Attorney General Janet Reno, all in their official capacities only. Plaintiffs alleged that the San Antonio INS office relied on information in their respective applications for Special Agricultural Worker status while reviewing their applications for naturalization, despite the confidentiality provision set forth in 8 U.S.C. § 1160(b)(6)(A)(i). Plaintiffs sought declarative and injunctive relief on behalf of a putative class that would have been affected by this policy. Because none of the class representatives had been denied citizenship after exhausting the statutorily mandated review process, their suit was dismissed by the district court for lack of subject-matter jurisdiction. For the same reason, we affirm the dismissal.

**Background**

*A. The Applicable Laws*

In 1986, Congress recognized that a "shadow population" of millions of illegal immigrants had been living in this country for a number of years. H.R. REP. 99-682(I), at 49 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5653; *McNary v. Haitian Refugee Center, Inc.*, 111 S.Ct. 888, 891 (1991). Yet, despite their contributions to employers and their communities, these immigrants were victimized because their undocumented status rendered them afraid to seek help from the governmental authorities. H.R. REP. 99-682(I), at 49 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5653.

2

Because Congress found it undesirable that the INS would spend its resources intensifying interior enforcement or attempting to deport these aliens *en masse*, they amended the Immigration and Naturalization Act to legalize the immigration status of certain categories of these aliens. This would permit those aliens to openly contribute to American society and allow the INS to focus its efforts on border enforcement. *Id*. The legislation also made the burden on undocumented aliens more onerous by criminalizing the hiring of undocumented workers and denying them many federal welfare benefits. *McNary*, 111 S.Ct. at 891. One subsection of this legislation addressed the fact that producers of perishable agricultural commodities had come to heavily rely upon an undocumented labor force. In order to keep these laborers available for work at these farms but give them the independence to move from job to job at their discretion, Congress created the "Special Agricultural Worker" or "SAW" program. H.R. REP. 99-682(I), at 83-85 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5687-89. Under the SAW program, a worker could apply for "temporary resident" immigration status during a specified eighteen-month period if he could prove both that he has resided in the United States and that he performed "seasonal agricultural services" in the United States for at least ninety days during the period from May 1, 1985 to May 1, 1986. *See* 8 U.S.C. § 1160(a)(1). After a fixed period of either one or two years, depending on the number of

3

applicants, those temporary resident workers would automatically receive permanent resident status. *Id*. at § 1160(a)(2).

A prominent feature of the SAW statute was its confidentiality guarantee. The government was forbidden to "use the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application. . . ." *Id*. at § 1160(b)(6)(A)(i). The government could, however, rely on any other information in its file as well as any information it could obtain from another source. *Id*. at § 1160(b)(6)(C)(i). Congress did not directly explain the purpose of this provision, but in regard to similar language elsewhere in the legislation Congress commented that "[t]he confidentiality of the records is meant to assure applicants that the legalization process is serious, and not a ruse to invite undocumented aliens to come forward only to be snared by the INS." H.R. REP. 99-682(I), at 73 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5677. This confidentiality provision has been strictly construed. In *In re Masri*, Int. Dec. 3419 (BIA 1999), the Board of Immigration Appeals held that the confidential information could not be used in a later proceeding to rescind permanent resident status, even though the recission was based on alleged fraud in the SAW application process. *See also* 8 C.F.R. § 210.2(e)(3) (implementing the statute strictly).

After five years of continuous residence following lawful

4

admission to permanent residence, an alien becomes eligible to apply for naturalization. 8 U.S.C. § 1427(a). A naturalization applicant must demonstrate, *inter alia*, good moral character; the ability to read, write and speak English; and a basic knowledge of United States history and government. *See* 8 U.S.C. § 1423(a), § 1427(a)(3). The applicant also has the burden of proving he was "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429. Once the application has been filed, an INS officer interviews the applicant and makes a determination to either approve or deny the application. 8 U.S.C. § 1446. If the application is denied, the applicant can request a hearing before an immigration officer. 8 U.S.C. § 1447(a). This second hearing must be before an officer of a higher grade level than the first. 8 C.F.R. § 336.2(b). If the INS again denies the application, or if 120 days elapse from the date of the first determination without the reconsideration taking place, the applicant may seek review of the denial in the United States District Court. 8 U.S.C. § 1421(c). Applicants may only appeal to the district court, however, if they either sought administrative review and the application was again denied, or if they sought administrative review and the review was delayed for more than 120 days. *Id.* at § 1421(d). Rather than conducting an administrative review, the district court reviews the case *de novo* and makes its own findings of fact and conclusions of law. *Id.*

5

*B.  The Present Appeal*

   *1.  The Class Representatives*

The three appellant class representatives share a similar story.  They are each Mexican nationals who applied for and received temporary resident status under the SAW program in 1988, and accordingly then received permanent resident status automatically in 1990.  They each applied for naturalization in 1998 or 1999, and for that purpose were interviewed in 1999 and 2000 in the San Antonio office of the INS.  During their interviews, each claims he or she was quizzed extensively about the agricultural work that had qualified him or her for SAW status and each claims the INS interviewer had reviewed the confidential information from his or her SAW application.  For each of them, the interview was followed by a letter from the INS commanding him or her to produce evidence corroborating the legitimacy of his or her agricultural work.

From that point, their experiences diverged somewhat.  Javier Aparicio responded to the follow-up letter by filing this class action lawsuit against the INS challenging their practice of reviewing the SAW information.  The INS reiterated its demand for the corroborating evidence, and Aparicio's reply informed the INS that he was unable to acquire the information and alleged the request violated the SAW confidentiality provisions.  On June 26, 2000, the INS informed Aparicio that it had independently

6

investigated the lawfulness of his permanent resident status and approved his application for naturalization. This approval came before the district court considered the motion to dismiss at issue in this case.

Judith Rangel responded to the letter by providing some, but not all, of the requested corroboration. The INS denied her application on October 8, 1999, and she never sought any sort of review of that denial. On June 5, 2000, Aparicio amended his lawsuit to include Rangel as a class representative.

Eliseo Realzola received the letter and then submitted the proof he was able to obtain along with explanations why he could not obtain the rest. On October 19, 1999, the INS informed Realzola that his evidence was insufficient and ordered him to provide corroboration. He did not do so, and on June 5, 2000 he joined Aparicio's suit as a class representative. The INS finally approved Realzola's application for naturalization on February 21, 2001, four months after the present appeal was filed.

2. *The Lawsuit*

Aparicio filed his class action lawsuit on April 14, 2000, on behalf of himself and the class of persons who received permanent resident status through the SAW program and who had applied for or would apply for naturalization through the San Antonio INS office. He sued the Immigration and Naturalization Service itself, as well as (in their official capacities) Wiley Blakeway, the head of the

7

San Antonio INS Citizenship Branch, Kenneth Pasquarell, the Director of the San Antonio INS District, and Attorney General Janet Reno. Aparicio alleged the INS's use of the confidential SAW application information in the naturalization process violated 8 U.S.C. § 1160(b)(6)(A)(i) and the constitutional right to due process, and sought a declaratory judgment, an injunction against the further use of the confidential information, and an injunction to reopen all cases affected by this practice that had been denied or withdrawn for lack of prosecution. Aparicio then filed for a preliminary injunction against the continued use of the confidential information and moved to certify the class. Aparicio aggressively began discovery, but the INS moved for a protective order on the grounds that discovery was premature. The district court granted the protective order on June 2, 2000. On June 5, 2000, Aparicio amended his complaint to include Rangel and Realzola as class representatives.

The district court granted a motion to dismiss the suit on August 31, 2000, holding the plaintiffs' claims were unripe because they had not exhausted the statutory appeal procedures before taking their case to the district court. The present appeal followed.

### Discussion

This court must consider whether the district court correctly dismissed Aparicio's suit. We review this decision *de novo*. *See*

8

*Home Builders Ass'n v. City of Madison, Miss*., 143 F.3d 1006, 1010 (5th Cir. 1998). It is worthwhile to begin by noting that Aparicio raises neither a privacy concern nor a challenge to the original process of applying for SAW status. Aparicio also conceded at oral argument that the INS can investigate whether SAW status was properly granted, so long as the INS does not use the information made confidential by 8 U.S.C. § 1160(b)(6)(A)(i). Similarly, the INS does not attempt to revoke the SAW (or lawful permanent residence) status of the appellants, and appellants do not contend that it does; rather, the INS seeks only to use the confidential application information when and for purposes of determining whether the naturalization applicant was "lawfully admitted to the United States for permanent residence" as required for naturalization by 8 U.S.C. § 1429. The plaintiffs' suit, thus properly understood, challenges only the INS's alleged practice of referring to the confidential SAW information solely during and for purposes of the naturalization process. May the district court take jurisdiction over this claim given that all three class representatives failed to follow the administrative review process mandated by 8 U.S.C. § 1421? We hold today that the district court correctly declined jurisdiction.

A. *McNary v. Haitian Refugee Center, Inc*.

The legal issues in this case stand under the shadow of two Supreme Court cases, the first of which is *McNary v. Haitian*

*Refugee Center, Inc*., 111 S.Ct. 888 (1991). Appellants rely on *McNary* to support their claim that challenges to INS practices and statutory interpretation lie outside mandatory review provisions.

In *McNary*, seventeen unsuccessful SAW applicants and two refugee services challenged the procedure by which the INS reviewed SAW applications. *McNary*, 111 S.Ct. at 893. The suit challenged INS practices including, *inter alia,* refusing to show adverse evidence to the applicant, refusing to allow the applicant to rebut adverse evidence, refusing to allow applicants to present witnesses on their own behalf, refusing to provide competent interpreters, and refusing to make a transcript of the hearing. *Id*. at 894. After the district court entered an injunction against it, the INS appealed, ultimately raising before the Supreme Court the sole contention that the district court lacked jurisdiction over the case due to the exclusive review provisions in 8 U.S.C. § 1160(e)(1). *Id*. at 894-95. The Supreme Court rejected the INS's contention, finding that the provision only applied to "a determination respecting an [SAW] application" and a generalized challenge to INS practice was not contemplated by this statutory language. *Id*. at 896. The Court also held the statutory words "such denial" indicated a singular decision, not a pattern or practice. *Id*. The Court found additional support by reasoning that the administrative review process would not generate the type of record necessary for reviewing the plaintiffs' claims, and thus

10

Congress did not contemplate that procedural and constitutional claims would come within that provision. *Id*. Additionally, the Court reasoned that the "abuse of discretion" standard of review mandated by the statute would be improper for the claims raised by the plaintiffs, further indicating that Congress never intended for the exclusive review provision to apply to such challenges. *Id*. at 897.

Though it had been the cornerstone of the INS's case, the *McNary* Court distinguished *Heckler v. Ringer*, 104 S.Ct. 2013 (1984) on several grounds. In *Heckler*, the plaintiffs had sought review of a Medicare policy denying them a particular form of surgery, but the Court held the federal courts lacked jurisdiction because the plaintiffs had not followed the administrative review procedures. *Heckler*, 104 S.Ct. at 2021-23. The *McNary* Court held the *Heckler* plaintiffs had essentially sought review of the denial of their benefits and a substantive declaration of their rights, which was a direct appeal within the contemplation of the Medicare review statute, while the *McNary* plaintiffs went outside the SAW statute by generally challenging INS practices and merely asking that their case files be reconsidered in light of the newly prescribed procedures. *McNary*, 111 S.Ct. at 897-98. The Court also reasoned that the *Heckler* plaintiffs had been able to receive a meaningful review while the *McNary* plaintiffs would not: no adequate record was assembled during the INS administrative review process,

especially not for the type of challenges being raised by the plaintiffs. *Id*. at 898. Moreover, direct judicial review would have been available only in a deportation proceeding and thus was "tantamount to a complete denial of judicial review for most undocumented aliens." *Id*. The Court therefore distinguished *Heckler* and affirmed the decision to accept jurisdiction over the case. *Id*. at 899.

B.  *Reno v. Catholic Social Services*

The Court revisited *McNary* in *Reno v. Catholic Social Services, Inc*., 113 S.Ct. 2485 (1993) [hereinafter "*CSS*"], the second case affecting our decision today. In *CSS*, the Court again addressed the effects of the 1986 reform of the Immigration and Naturalization Act. The *CSS* Court addressed two separate challenges to the INS interpretation of the statutory provisions permitting certain undocumented aliens to receive temporary resident status. The first concerned the requirement that the alien show "continuous physical presence" since a certain date; the INS had determined that the statutory exception for "brief, casual and innocent" absences would only be permitted if the alien had received advance permission from the INS. *Id*. at 2490. The second challenge addressed the requirement that the alien show "continuous unlawful residence" in the United States during that period, with a statutory exception for certain brief periods. The INS regulations said that an alien who left the country and then

12

reentered by showing "facially valid" documentation had broken the chain of "unlawfulness" and therefore could not meet this standard. *Id.* at 2491. In both cases, the INS modified the rule not long after it was initially promulgated. In neither case did the INS appeal the initial determination that the regulations were invalid, but in both cases the INS challenged a later order of the district court seeking to extend the application period because of the error. *Id*. at 2493. The INS argued that the district court lacked jurisdiction due to the restricted judicial review mandated by the Act. *Id.*

The Court accepted both appeals and decided to vacate and remand. *Id*. The Court recognized that the limited judicial review provision, 8 U.S.C. § 1255a(f)(1), was "virtually identical" to the provision it had interpreted in *McNary* two years earlier. Accordingly, the Court again held that the statutory language "a determination respecting an application for adjustment of status" and "such denial" did not describe a challenge to a practice or procedure. *Id*. at 2494-95. The INS claimed that an action challenging the INS's interpretation of a statute was different than the procedural challenge in *McNary*, but the Court rejected the argument and held the the plaintiffs' arguments were not restricted by the limited review provision. *Id*. at 2495.

The Court then noted that another jurisdictional hurdle lay in the path of the plaintiffs: the ripeness requirement traditionally

13

applied in suits seeking injunctive and declarative relief. *Id*. at 2495. The Court noted that sometimes the very promulgation of a regulation creates an "immediate dilemma" that causes parties to feel the impact in a concrete way. Such claims are already ripe. *Id*. In other cases, the impact of the regulation cannot be said to "be felt immediately by those subject to it in conducting their day-to-day affairs." *Id*. at 2496, *quoting Toilet Goods Assn., Inc. v. Gardner*, 87 S.Ct. 1520, 1524 (1967). In such cases, the claim would not be ripe if there were "no irremediably adverse consequences." *CSS*, 113 S.Ct. at 2496. The Court then addressed the INS regulations at issue and noted they were limitations on access to a benefit, not a newly imposed restriction, and thus did not seem to have an immediate impact. *Id*. Moreover, the Court observed that the Act delegated to the INS the task of determining whether applicants met several requirements in addition to the ones at issue, which also suggested that the impact of the regulations was deferred rather than immediate. Because the INS must apply these several regulations on a case-by-case basis, the Court held, a plaintiff's claims would only ripen "once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." *Id*.

The Court then recognized that a case would only become ripe when "the INS formally denied the alien's application on the ground that the regulation rendered him ineligible for legalization." *Id*.

14

at 2497. Such an alien, however, would find his newly ripe case barred by the exclusive review provisions because it would now be "a determination respecting an application." *Id*. The Court considered this interaction to be an intentional "dovetailing" of the two provisions, representing Congress's intent to insure that INS regulations would only be challenged through the limited channels permitted by the Act. *Id*. The *McNary* plaintiffs were allowed to circumvent this scheme because they had no "practical judicial review." In contrast, the *CSS* plaintiffs would be able to raise their arguments on appeal, even though that appeal would only come during the review of a deportation order. The *CSS* plaintiffs therefore had to content themselves with the "dovetailed" provisions. *Id*.

The Court then determined that the parties whose claims were accepted for processing by the INS were constrained by the mandatory review provisions, although parties whose applications lower level INS personnel informally refused to even accept for filing due to an INS "front-desking" policy may have been outside the mandatory review provisions. *Id*. at 2497-2500. The *CSS* Court noted in the latter connection:

> "[Front-desking] *would effectively exclude an applicant from access even to the limited administrative and judicial review procedures established by the Reform Act.* He would have no formal denial to appeal to the Associate Commissioner for Examinations, nor would he have an opportunity to build an administrative record on which judicial review might be based. Hence, to construe § 1255a(f)(1) to bar district court jurisdiction over his

15

challenge, we would have to impute to Congress an intent to *preclude judicial review of the legality of INS action entirely under those circumstances*. As we stated recently in *McNary*, however, there is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action," 498 U.S., at 496, 111 S.Ct., at 898; and we will accordingly find an intent to preclude such review only if presented with '"clear and convincing evidence,"'[citations omitted].

There is no such clear and convincing evidence in the statute before us. Although the phrase 'a determination respecting an application for adjustment of status' could conceivably encompass a Legalization Assistant's *refusal to accept the application for filing at the front desk of a Legalization Office*, nothing in the statute suggests, let alone demonstrates, that Congress was using 'determination' in such an extended and *informal* sense. Indeed, at least one related statutory provision suggests just the opposite. Section 1255a(f)(3)(B) limits administrative appellate review to 'the administrative record established at the time of the determination on the application'; because *there obviously can be no administrative record in the case of a front-desked application, the term 'determination' is best read to exclude front-desking*. Thus, just as we avoided an interpretation of 8 U.S.C. § 1160(e) in *McNary* that would have amounted to 'the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims,' *McNary, supra*, 498 U.S., at 497, 111 S.Ct., at 899, so here *we avoid an interpretation of § 1255a(f)(1) that would bar front-desked applicants from ever obtaining judicial review of the regulations that rendered them ineligible for legalization*." *Id*. at 2499 (footnote omitted; emphasis added).

Accordingly, the *CSS* Court vacated and remanded the case so that the District Courts could determine which claims had been subjected to "front-desking" and thus were ripe. *Id*. at 2500. All other claims were barred by the statutory judicial review provisions.

16

*C. The Present Case*

  *1. The Claims Are All Unripe*

We hold that to the extent appellants' claims are unripe they are barred by CSS. To the extent the claims are ripe, they are barred by 8 U.S.C. § 1421(c), which provides:

> "A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of Title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application."[1]

It must be recognized then that the naturalization statute does not contain many of the features upon which the *McNary* opinion relied and upon which *CSS* relied in regard to those whose applications were "front-desked." Judicial review of naturalization denials is always available and is de novo, and is not limited to any administrative record but rather may be on facts established in and found by the district court de novo.

As with the regulations in *CSS*, the INS interpretation challenged in this case did *not* have an immediate effect on the day-to-day affairs of those who received permanent resident status through the SAW provisions. Instead, the INS interpretation "limit[s] access to a benefit [here naturalization] . . . not

---

[1]*See also* § 1421(d), providing: "A person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise."

automatically bestowed on eligible aliens." *CSS*, 113 S.Ct. at 2496. The INS has the duty of determining whether each applicant for naturalization has "met all of the Act's conditions, not merely those interpreted by the [challenged practices] in question." *Id*. As a result, we come to the same conclusion as the Court in *CSS*: "a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." *Id*.

Here, if a claim was approved, then the applicant has no grounds for complaint because his path has not been "blocked" and he has suffered no "irredeemably adverse consequence." The federal courts not acting under section 1421(c) must reject all denied claims as well. Because there are many possible reasons for a denial of naturalization,[2] not merely matters which would arise under the interpretations of section 1160(b)(6)(A)(i) at issue in this case, we cannot know whether a denied claim was denied for any of the reasons challenged here. *See CSS*, 113 S.Ct. at 2496-97 n.20. Pending claims would suffer from the same uncertainty, and uncertainty renders the case unripe for consideration by the federal courts.

---

[2]*See e.g.* § 1423(a) (applicant must demonstrate "ability to read, write, and speak words in ordinary usage in the English language" and "a knowledge and understanding of the history, and of the principles and form of government, of the United States"); § 1427(a) (throughout the immediately preceding five years the applicant "has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States").

18

Rangel's naturalization application has been administratively denied, and consideration of her claim *in this suit* would be reviewing the denial of her application for naturalization in violation of section 1421(c). *See CSS*, 113 S.Ct. at 2497. Similarly, the appellants seem to hope this Court will look at the record and find that Aparicio, whose naturalization application has been approved, would have had it approved sooner but for the allegedly impermissible policy. We cannot do so; once we begin to look at the specifics of Aparicio's case we will be allowing him to seek review of his application in the district court without it having been "denied." Section 1421(c) prohibits this result. The same is true of Realzola.

The appellants and the entire class they seek to represent are thus caught between the ripeness doctrine and the exclusive review provision of section 1421(c). We conclude that this was an intentional formulation by Congress designed to serve a purpose. In *CSS*, the Court reasoned that "Congress may well have assumed that, in the ordinary case, the courts would not hear a challenge to regulations specifying limits to eligibility before those regulations were actually applied to an individual, whose challenge to the denial of an individual application would proceed within the Reform Act's limited scheme." *CSS*, 113 S.Ct. at 2497. We conclude that Congress intended naturalization applicants to be thus restricted, not out of any desire to vex them but rather to

19

guarantee that the only people who challenged the INS's interpretation of the Act would be those whose applications had been denied and who then worked within the administrative review system before resorting to the federal courts, with such resort being only pursuant to section 1421(c). The appellants do not meet this definition, nor would anyone within their putative class.

Appellants attempt to argue ripeness by complaining that they lose the privileges and rights of citizenship during the appeal process, but the 120-day limit imposed by section 1421(c) guarantees a relatively swift resolution. Indeed, by the accepted norms of the federal bureaucracy and the delay endemic to the system, 120 days, or even much longer, seem not so egregious as to authorize departure from the evident Congressional scheme of review. At any rate, it is less onerous than the *CSS* requirement that the applicants seek review in an appeal from an order of deportation. If the delay and uncertainty inherent in a deportation action did not make the *CSS* cases ripe, the present case must be considered unripe as well.

*2. The Review Is Adequate*

There remains one more point to analyze. The *CSS* Court noted that the *McNary* plaintiffs had escaped this system because they "could receive no practical judicial review within the scheme"

established by Congress.  In contrast, the *CSS* plaintiffs[3] were stuck within the system because it could afford the plaintiffs an adequate review, albeit one that only occurred during the appeal of a deportation order.  *CSS*, 113 S.Ct. at 2497.  Thus, the availability of review in *CSS* satisfied the need for review of administrative processes emphasized in *McNary* and in *Bowen v. Michigan Academy of Family Physicians*, 106 S.Ct. 2133 (1986).  *See McNary*, 111 S.Ct. at 899 (quoting *Bowen*).  It has been suggested that this exception for inadequate judicial review is all that remains of *McNary*'s end-run around mandatory review provisions. *See Ayuda, Inc. v. Reno*, 7 F.3d 246, 249 (D.C. Cir. 1993).

Regardless, the appellants can find no relief in this inadequate review exception.  The review afforded them by section 1421(c) is fully *de novo*, with the district court considering evidence brought before it and making its own findings of fact and conclusions of law.  *See* 8 U.S.C. § 1421(c).  Congress has therefore afforded the appellants a complete and wholly adequate review, greatly in excess of the review found acceptable in *CSS*. We also note that the applicants here are not fighting to gain or keep their permanent resident status through the one-time-only SAW program, but merely seek to be naturalized.  Nothing prevents an applicant denied naturalization from filing another application.

---

[3]Other than those who were "front-desked" and suffered the same lack of avenue for meaningful administrative or judicial review as the *McNary* plaintiffs.

21

Finally, while the possible delays in the system may be frustrating, a delay of some 120 days-or much longer-- does not render the appeal so inadequate as to allow the plaintiffs to escape Congress's intended review process.

The appellants have a sufficient review available to them, and therefore they (and the class they purport to represent) can only challenge the INS interpretation of 8 U.S.C. § 1429 and § 1160(b)(6)(A)(i) by waiting for an application to be denied, and then by appealing that denial through the process set forth in section 1421(c).[4]

## Conclusion

The appellants raise a generalized challenge to the INS's interpretation of two statutes, as embodied in the practice of the San Antonio INS office. Their claims are not ripe because they have either not felt the full impact of the interpretation by being "blocked" from naturalization or have been denied or delayed for an uncertain reason. If the claims were ripe, they would be barred by section 1421; if not barred by section 1421, they would not be ripe. It seems that Congress desired that this issue only be raised by plaintiffs who were denied naturalization and who followed the administrative and judicial appeal process. Finally,

---

[4] By holding the case unripe as to the entire class, we need not address the question of whether the class could be certified despite the failings of the class representatives. *See, e.g.,* *United States Parole Com'n v. Geraghty*, 100 S.Ct. 1202 (1980).

22

appellants may not take the *McNary* escape route from this dilemma because section 1421 provides an adequate review for their challenge.  Accordingly, the district court was correct to dismiss the case.

AFFIRMED.